# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

PARISH OF CAMERON ET AL         CASE NO. 2:18-CV-00677

VERSUS         JUDGE SUMMERHAYS

AUSTER OIL & GAS INC ET AL         MAGISTRATE JUDGE KAY

## REASONS FOR DECISION

Presently before the court is the Report and Recommendation [doc. 103] issued by the Magistrate Judge regarding the Motion to Remand [doc. 67] filed by the Parish of Cameron and a Motion to Remand [doc. 71] filed by intervenor-plaintiffs, the State of Louisiana ex rel., the Louisiana Attorney General, and the Louisiana Department of Natural Resources (hereafter, state and parish parties referred to collectively as "Plaintiffs"). In her Report and Recommendation, the Magistrate Judge recommends that the Motion to Remand be granted on the grounds that removal was untimely. While the Court concludes that removal here was timely, the Court agrees with the Magistrate Judge that the Motion to Remand should be granted as explained below. Accordingly, the motions [doc. 67 and 71] are GRANTED.

## I.

## BACKGROUND

Several Louisiana parishes filed forty-two lawsuits against various oilfield-related defendants[1] (hereafter, all defendants in these matters will collectively be referred to as

---

[1] Alpine Exploration Companies, Inc., Anadarko E&P Onshore, LLC, Anderson Exploration Company, Incorporated, Apache Corporation (Of Delaware), Apache Oil Corporation, Atlantic Richfield Company, Auster Oil and Gas, Inc.,

"Defendants") in state court alleging violations of permits issued under the State and Local Coastal Resources Management Act of 1978 ("SLCRMA") also known as the Coastal Zone Management Act, La. Rev. Stat. § 49:214.21 *et seq.*, and associated regulations, rules, and ordinances ("CZM laws") based upon the defendants' dredging, drilling, and waste disposal in coastal parishes. *See, e.g., doc.* 1, att. 59, pp. 3–26.

SLCRMA provides a cause of action against companies that either violate a state-issued coastal use permit or fail to properly obtain a coastal use permit when required. The act also contains certain exemptions from the coastal use permitting requirements, namely, uses which do not have a significant impact on coastal waters[2] and activities which were "lawfully commenced"

---

Badger Oil Corporation, Ballard Exploration Company, Inc., Bay Coquille, Inc., Bepco, L.P., Bopco, L.P., BP America Production Company, Brammer Engineering, Inc., Burlington Resources Oil & Gas Company, LP, Cedyco Corporation, Central Resources, Inc., Centurion Exploration Company, Chevron Pipe Line Company, Chevron U.S.A. Holdings, Inc., Chevron U.S.A., Inc., Condor Petroleum Corporation, ConocoPhillips Company, Covey Energy, Inc., Crimson Exploration Operating, Inc., Cypress E&P Corporation, Darsey Operating Corporation, Davis Oil Company, Davis Petroleum Corporation, Denbury Onshore, LLC, Denovo Oil & Gas, Inc., Devon Energy Production Company, L.P., Diasu Oil & Gas Company, Dominion Oklahoma Texas Exploration & Production, Inc., Endeavor Energy Resources, L.P., Energen Resources Corporation, Energy Properties, Inc., Energyquest II, LLC, Enervest Operating, L.L.C., Estate of William G. Helis, Exchange Oil & Gas Corporation, Exco Resources, Inc., Exxon Mobil Corporation, Fieldwood Sd Offshore LLC, Freeport Sulphur Company, Freeport-Mcmoran Oil & Gas L.L.C., Gas Transportation Corporation, Graham Royalty, Ltd., Great Southern Oil & Gas Company, Inc., Gulfport Energy Corporation, Helis Oil & Gas Company, L.L.C., Henry Production Company, Inc., Hess Corporation, Hilcorp Energy Company, Hilliard Petroleum Inc., Linder Oil Company, A Partnership, Honeywell International, Inc., HRC Energy Holdings (La), Inc., Hunt Oil Company, Iberia Operating Corporation, Indian Exploration, Inc., Inexco Oil Company, Jones Co., Ltd., Kerr-Mcgee Oil And Gas Onshore LP, Kilroy Company Of Texas, Inc., La Mesa Production Inc., Latex-Star, Inc., Leads Resources L.L.C., Linder Oil Company, A Partnership, LLOG Exploration & Production Company, L.L.C., LLOG Exploration Company, L.L.C., Lopco, Inc., Louisiana Energy Production LLC, Lyons Petroleum, Inc., Mar-Low Corporation, Marsh Engineering, Inc., Mccormick Operating Company, Merit Energy Company, LLC, Mobil Oil Exploration & Producing, Mobil Oil Exploration & Producing Southeast Inc., Mosaic Global Holdings, Inc., Northwest Oil Company, Oleum Operating Company, L.C., Omni Operating Co., Oxy USA Inc., Palace Operating Company, Petroquest Energy, L.L.C., Resource Securities Corporation, Resources Investment Corporation, Rogers Oil Co., Sable Minerals, Inc., Samuel Gary Jr. & Associates, Inc., Shell Offshore, Inc., Shell Oil Company, Shocker Energy Of Louisiana, Inc., Shoreline Southeast LLC, SM Energy Company, Southeast Inc., Southport Exploration, Inc., Star Energy, Inc., Swepi LP, SWN Production Company, LLC, Taylor Energy Company, LLC, Texas Pacific Oil Company, Inc., Texas Petroleum Investment Company, The Louisiana Land And Exploration Company, LLC, The Meridian Resource & Exploration LLC, The Texas Company, Toce Energy, L.L.C., Total Petrochemicals & Refining USA, Inc., Transco Exploration Company, Transcontinental Oil Corporation, Union Oil Company of California, Vernon E. Faulconer, Inc., Vintage Petroleum, L.L.C., Wagner Oil Company, Walter Oil & Gas Corporation, WEC Onshore, LLC, White Oak Operating Company, LLC., Whiting Petroleum Corporation, Williams Exploration Company, Xplor Energy Operating Company, Xto Energy Inc., Zadeck Energy Group, Inc., Zenergy, Inc.

[2] La. R.S. § 49:214.34(A)(10)

prior to the enactment of SLCRMA -- the so-called "historical use" or "lawfully commenced" exemption.[3] Plaintiffs assert that the pre-SLCRMA activities by defendants were not lawfully commenced and therefore do not fall within the exemption.

The cases were previously removed to this Court on the basis of admiralty jurisdiction, federal jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b)(1), and federal question jurisdiction under 28 U.S.C. § 1331. Those cases were remanded when the Court rejected these grounds for removal. As for OCSLA, the Court found that the activities involved did not take place on the Outer Continental Shelf. The Court also found that admiralty claims brought at law in state court pursuant to the Saving to Suitors' Clause are not removable in the absence of an independent jurisdictional basis. Finally, the Court held that the defendants could establish no federal question jurisdiction because the remedies sought were specifically limited to those arising under state law.[4]

Defendants have now removed this case along with eleven others again. The current Notice of Removal, filed on May 23, 2018, asserts federal officer jurisdiction under 28 U.S.C § 1442 and federal question jurisdiction under 28 U.S.C. § 1331.[5] Defendants claim that they first became aware of these removal grounds when they received an expert report in a related case on April 30, 2018.[6] Defendants argue that this expert report reveals for the first time that Plaintiffs' claims primarily attack activities undertaken before SLCRMA's effective date (1980), including activities that were subject to extensive and exclusive federal direction, control, and regulation during World War II.

---

[3] La. R.S. § 49:214.34(C)(2)
[4] See *Cameron Parish v. Auster Oil & Gas, Inc.*, W.D. La. 2:16-cv-530, Doc. 89, 101 and 102.
[5] Doc. 1.
[6] Expert report issued by Plaintiffs in the case of *Parish of Plaquemines v. Rozel Operating Co.* (the "*Rozel* Report").

Plaintiffs have filed motions to remand, arguing that (1) the claim of federal officer jurisdiction is without merit; (2) the claim of federal question jurisdiction is without merit and is also precluded from re-litigation; and (3) removal was untimely because the expert report was received months, if not years, after the removing defendants knew or should have known of the nature of the claims asserted by Plaintiffs. Defendants opposed the Motions to Remand.

On November 20, 2018, the Magistrate Judge issued a Report and Recommendation, recommending that the Motions to Remand be granted because removal was untimely. The recommendation that the removal was untimely was based upon the fact that the Plaintiffs' original petition makes numerous references to Defendants' activities which took place prior to the enactment of SLCRMA and that Defendants were put on notice that pre-SLCRMA activities were at issue. Defendants timely objected to the Report and Recommendation.

## II.

## LAW AND ANALYSIS

### A. Timeliness of Removal.

A notice of removal must be filed within 30 days of receipt of the initial pleading in the case by the defendant. 28 U.S.C. § 1446(b). However, if the initial pleading does not set forth grounds for removal, "a notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable."[7] The Fifth Circuit has held that "the information supporting removal in a copy of an amended pleading, motion, order or other paper must be 'unequivocally clear and certain' to start the time limit running for a notice of removal." *Bosky v. Kroger Texas, LP*, 288 F.3d 208 (5th Cir.

---

[7] 28 U.S.C. 1446(b)(3).

2002). The document need not be a filing to qualify as an "other paper."[8] Under some circumstances, a paper filed in another case may also qualify. *Id.* However, if the removal is based on an "other paper," that paper must still result from a voluntary act by the plaintiff. *Addo v. Globe Life and Acc. Ins. Co.,* 230 F.3d 759, 761–62 (5th Cir. 2000). Generally, when courts are looking to an "other paper" to determine removability, they are addressing the question in the context of a diversity jurisdiction case.[9] "The presence or absence of federal-question jurisdiction is governed by the well-pleaded complaint rule, under which federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Rivet v. Regions Bank of La.,* 522 U.S. 470, 475, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998). However, under some limited circumstances, courts do look to an "other paper" to establish federal question jurisdiction. For example, a court may look to an "other paper" to determine whether a plaintiff's state law claim may be one that is preempted by federal law.[10]

The requirement that the grounds for removal be "unequivocally clear and certain" creates a bright line rule requiring that the document itself reveal the grounds for removal before a party's removal rights are subject to the 30-day cutoff.[11] A party's subjective knowledge is not sufficient to trigger the removal deadline.[12] Similarly, the Fifth Circuit does not impose a due diligence requirement on the defendant to uncover the grounds for removal based on an ambiguous pleading.[13]

In the instant case, the "other paper" on which defendants base their theory of removability is an expert report filed in a related case in state court by Plaintiffs, called the *Rozel* Report. The

---

[8] *Brunet v. Butler*, 2012 WL 2338740, at *3 (E.D. La. Jun. 19, 2012).
[9] *Eggert v. Britton*, 223 Fed. App'x 394 (5th Cir. 2007).
[10] *Peters v. Lincoln Elec. Co.*, 285 F.3d 456 (6th Cir. 2002).
[11] *Bosky v. Kroger Texas, LP*, 288 F. 3d 208, 209 (5th Cir. 2002).
[12] *Id* at 210.
[13] *Chapman v. Powermatic, Inc.*, 969 F.2d 160 (5th Cir. 1992).

*Rozel* Report details the precise activities which Plaintiffs allege caused damage and also specifies preferred methods which would have prevented the damage. Defendants assert that this report revealed for the first time that Plaintiffs were attacking activities which were subject to extensive federal direction, control and regulation. Plaintiffs maintain that they have repeatedly referenced pre-SLCRMA activities dating back to the original complaint. Defendants contend, however, that while the prior filings may have referenced pre-SLCRMA activities, they did not reveal that Plaintiffs were challenging specific activities which were heavily regulated by the federal government during World War II. The *Rozel* Report offers the opinion that there are three types of activities which occurred which violated SLCRMA, namely:

> First, there were certain uses that were legally commenced before 1980 but whose impacts changed post-1980, triggering the requirement for a permit that was never obtained. Second, there were certain uses that were illegally commenced at their beginning and therefore did not qualify for the exemption from coastal permitting or review. And third, there were certain uses that were commenced after 1980 that did not receive appropriate permits under SLCRMA.

The *Rozel* Report also relies on language from a 1980 federal Final Environment Impact Statement ("FEIS"), which was submitted for proposed federal approval of Louisiana's Coastal Resources Program:

> Any use or activity which, prior to the initiation of the coastal use permit program, has been lawfully commenced in good faith and for which all required permits have been obtained is consistent with the Coastal Management Program and no coastal use permit is required for it.... Moreover, such use or activity shall thereafter be consistent with the program even if renewals of previously issued permits become necessary or if new permits are required by other governmental bodies provided that there is no significant change in the nature, size, shape, location or impacts of the use or activity.

The authors of the FEIS offered this language to provide guidance regarding the types of activities that would be exempt with regard to the so-called "historical use" exemption. Under Louisiana Administrative Code § 43:I.723.B.8, Louisiana law provides a "[b]lanket exemption" under which

a use or activity shall not require a coastal use permit if (1) the use or activity was lawfully commenced or established prior to the implementation of the coastal use permit process, (2) the secretary determines that it does not have a direct or significant impact on coastal waters, or (3) the secretary does not determine that a permit is required under § 723.G.

Defendants argue that Plaintiffs' adoption of this construction of the exemption necessarily injects a substantial federal question into the case to the extent that Plaintiffs are challenging activities regulated by the federal government during World War II. Defendants argue that their activities were exempt, while Plaintiffs claim they were not. The expert report provides opinions regarding whether the activities were legally commenced and whether they had an impact on coastal waters. Defendants assert the expert report is the first time that the pleadings or "other papers" clearly disclose the specific activities that plaintiffs claim were not exempt and why. They also contend that this report was the first time that the pleadings clearly and unambiguously disclose specific practices challenged by Plaintiffs that were heavily regulated during World War II.

The Magistrate Judge concluded that the Notice of Removal was untimely because the involvement of *pre-SLCRMA* activities – i.e., activities occurring before 1980 – was apparent in the original complaint filed by Plaintiffs. The Court disagrees. Based on the original complaint and subsequent pleadings, Defendants were on notice that some activities occurring during the broad time period before 1980 may be at issue in this case. However, the complaint and pleadings do not reveal that Plaintiffs would be challenging specific activities that took place from 1941 to 1945 when the federal government's World War II regulatory regime was in place. The basis for jurisdiction under the federal officer removal statute – whether a defendant was "acting under" a federal officer – requires scrutiny of the specific activities of the defendant and the relationship

between those activities and the federal government.[14] Federal court jurisdiction under *Grable* similarly requires some "assessment of litigation reality" to assess the substantiality of a federal issue; in other words, the role of each legal issue in the context of the facts that have to be established.[15] Here, allegations that merely point to pre-1980 activities do not trigger the removal deadline based on federal officer removal or federal question jurisdiction with respect to specific activities occurring during the World War II era. These allegations may put Defendants *on notice* that these activities could potentially become relevant, and Defendants could have investigated their pre-1980 activities and "connected the dots" to reveal grounds for federal court jurisdiction. However, the trigger for starting the removal clock requires a higher burden: the allegations must be in the complaint or "other paper" and must be "*unequivocally clear and certain.*"[16] A defendant's subjective knowledge is irrelevant in determining removability, and there is no duty on the part of the defendant to investigate and "connect the dots" outside the pleadings.[17]

The case of *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247 (9th Cir. 2006), illustrates this point.[18] The plaintiff had alleged asbestos exposure based on his work as an electrician at various Air Force facilities. He sued Lockheed. The complaint, however, did not identify which specific Lockheed products resulted in his exposure. At the time, Lockheed provided aircraft to the government under government contracts, and commercial aircraft to non-government buyers. A subsequent discovery response identified the specific Lockheed products at issue.[19] Once those products were identified, Lockheed removed the case on the basis that Lockheed manufactured the aircraft for the government under a government contract.[20] The court in *Durham* emphasized that

---

[14] *See, e.g., MTBE Prod. Liability*, 480 F.3d 112 (2d Cir. 2007).
[15] Wright & Miller, 13D Fed. Prac. & Proc. Juris. § 3562 (3d ed.).
[16] *Bosky*, 288 F.3d at 209 (emphasis added).
[17] *Id.* at 210.
[18] 445 F.3d at 1249.
[19] *Id.*
[20] *Id.* at 1249-50.

the specific facts supporting federal officer removal must be disclosed in the pleadings or an "other paper" before the time period to remove commences.[21] According to the court, until the specific Lockheed aircraft was identified, the grounds for removal had not been disclosed. It was irrelevant that Lockheed could, through investigation and due diligence, have uncovered the grounds for removal based on allegations identifying where the plaintiff worked. The *Durham* court also noted that the "liberal" interpretation of the federal officer removal provisions in 28 U.S.C. § 1442 extends to the deadline for removal.[22]

The Court finds the same reasoning applies in the instant case. Until the point when Plaintiffs revealed the specific activities mentioned in the *Rozel* Report, Defendants had no basis to assert the grounds for removal which they now assert. That report was filed in the related matter on April 30, 2018. As the Notice of Removal was filed on May 23, 2018, the Court finds that the removal was timely. As the removal was timely, the court will address the grounds for removal raised in the current Notice of Removal: "federal officer" removal under 28 U.S.C. § 1442(a) and federal question jurisdiction under 28 U.S.C. § 1331.

### B. Federal Officer Removal.

A defendant may remove any action against "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, [sued in] an official or individual capacity for any act under color of such office." 28 U.S.C. § 1442(a). "[F]ederal officer removal under § 1442 is unlike other removal doctrines: it is not narrow or limited." *State v. Kleinert*, 855 F.3d 305, 311 (5th Cir. 2017). The Supreme Court requires "a liberal interpretation of § 1442(a) in view of its chief purpose—to prevent federal officers who

---

[21] *Id.* at 1253. According to the court, this rule "protects the government's right of removal and encourages plaintiffs to disclose the facts underlying their claims early on. We note that an opposite result would encourage gamesmanship and defeat the policies underlying sections 1442 and 1446." *Id.*

[22] *Id.; see also Morgan v. Huntington Ingalls, Inc.*, 879 F.3d 602, at fn 10 citing *Durham* for this proposition.

simply comply with a federal duty from being punished by a state court for doing so." *State v. Sparks*, 978 F.2d 226, 232 (5th Cir. 1992). Section 1442 applies to any "private persons 'who lawfully assist' the federal officer 'in the performance of his official duty.'" *Watson v. Philip Morris*, 551 U.S. 142, 151 (2007). Section 1442(a) creates an exception to the "well-pleaded complaint" rule in that "the raising of a federal question in the officer's removal petition... constitutes the federal law under which the action against the federal officer arises for Article III purposes." *Mesa v. California*, 489 U.S. 121, 136 (1989). A defendant may remove a case under § 1442(a) by showing "(1) that it is a person within the meaning of the statute, (2) that it has a colorable federal defense, (3) that it acted pursuant to a federal officer's directions, and (4) that a causal nexus exists between [its] actions under color of federal office and the plaintiff's claims." *Legendre v. Huntington Ingalls*, 885 F.3d 398, 400 (5th Cir. 2018). There is no dispute that Defendants qualify as "persons" under the first requirement. Accordingly, the Court starts with the second requirement that Defendants "acted under" a federal officer's direction.

1.     <u>"Acting Under" a Federal Officer.</u>

To satisfy § 1442(a)'s "acting under" prong, a defendant must show "an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152. The *Watson* Court distinguished a party's *compliance* with federal regulations from actions "helping the Government to produce an item that it needs."[23] Assistance that "goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks" meets § 1442(a)'s "acting under" requirement.[24] To establish that a person is "acting under" a federal official, a removing party must show a "substantial degree of direct and detailed federal control over the defendant's

---

[23] *Id.* at 153.
[24] *Id.*

work...."[25] This relationship between the defendant and the federal office or official must involve "subjection, guidance, or control."[26] It is not sufficient to merely show that "the relevant acts occurred under the general auspices of a federal office or officer."[27]

The cases applying this "acting under" requirement provide useful guidance as to how to draw the line between "direct control" and mere regulation. Many cases where courts have found sufficient control and direction to satisfy the "acting under" requirement involve government contractors who manufacture products according to detailed specifications and oversight by an agency or officer of the federal government.[28] For example, in *Winters,* the plaintiff sued for personal injuries received as a result of exposure to Agent Orange while working as a civilian nurse for the United States Agency for International Development in Vietnam.[29] Diamond Shamrock was a government contractor that supplied the mix of herbicides known as Agent Orange to the United States Defense Department.[30] The Fifth Circuit affirmed the District Court's conclusion that Diamond Shamrock was "acting under" a federal office or office in supplying this mix of herbicides. The court observed that the Defense Department mandated a specific mixture of herbicides making up Agent Orange and that "the defendants were compelled to deliver Agent Orange to the government under threat of criminal sanctions."[31] The court concluded that the

---

[25] *In re "Agent Orange" Prod. Liab. Litig.*, 304 F. Supp. 2d 442, 447 (E.D. N.Y. 2004).
[26] *Zeringue v. Crane Co.*, 846, F.3d 785, 793 (5th Cir. 2017) (citing *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142 (2007))."
[27] *Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 947 (E.D. N.Y. 1992)
[28] *See, e.g., Zeringue*, 846 F.3d 785 (5th Cir. 2017) (government directives to use asbestos); *Savoie v. Huntington Ingalls, Inc.*, 817 F.3d 457, 460, 465 (5th Cir. 2016) (government requirement that contractor use asbestos in the thermal installation of Navy ships); *In re Asbestos Products Liab. Litig. (No. VI.)*, 7 F. Supp. 2d 736 (E.D. Pa. 2011) ("acting under" requirement satisfied where government contractor established that the government had approved reasonably precise specifications that called for the use of asbestos and that the contractor's products conformed to those specifications); *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 399 (5th Cir. 1998) (government contracted with the defendants for a specific mixture of herbicides known as Agent Orange); *Holdren v. Buffalo Comps, Inc.*, 614 F. Supp. 2d 129 (D. Mass. 2009) (contractor complied with precise design specifications).
[29] 149 F.3d at 390.
[30] *Id.*
[31] *Id.*

federal government exercised direct control over the composition and production of Agent Orange.[32] In other words, the plaintiff's injuries resulted from an aspect of the product that was mandated and controlled by the federal government under the terms of a contract with Diamond Shamrock.

Similarly, in *Zeringue*, the plaintiff sued multiple defendants for damages caused by asbestos exposure.[33] He claimed exposure while deployed with the U.S. Navy as well as exposure when he worked in the Avondale Shipyard near Navy ships that contained asbestos.[34] The court found that the defendants had "acted under" a federal office or officer with respect to these asbestos exposure claims because the Navy had mandated the use of asbestos insulation in its contract specifications and the defendants complied with those requirements.[35] According to the court, "equipment could not have been installed aboard Navy vessels unless it was first determined by the Navy to be in conformity with all applicable Navy specifications."[36] The court further noted that had the defendant not complied with the specifications and provided these products to the government, "the Navy would have had to build those parts instead."[37] In all of these cases, the plaintiffs' claims arose out of conduct *mandated* by the government.

On the other hand, two cases where the courts concluded that the "acting under" requirement was not satisfied illustrate the limits of federal officer removal: *Watson*, 120 S. Ct. 2301, and *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 480 F.3d 112 (2d Cir. 2007). In *Watson*, the plaintiffs alleged that Phillip Morris manipulated the design of its "light" cigarettes so that they tested for lower levels of tar and nicotine. The industry's testing process for

---

[32] *Id.*
[33] 846 F.3d 785.
[34] *Id.* at 788.
[35] *Id.*
[36] *Id.* at 792.
[37] *Id.*

measuring tar and nicotine was operated under the regulatory supervision of the Federal Trade Commission (FTC). The Supreme Court concluded that Phillip Morris was not "acting under" the FTC even though the testing process for tar and nicotine was heavily regulated. The Court noted that a private party's compliance with federal law or acquiescence to a federal agency's order does not satisfy the "acting under" requirement of the federal officer removal statute, "even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored."[38] In other words, differences in the degree of regulatory oversight alone cannot bring a regulated party within the contours of section 1442(a):

> As we have pointed out, however, differences in the degree of regulatory detail or supervision cannot by themselves transform Philip Morris' regulatory compliance into the kind of assistance that might bring the FTC within the scope of the statutory phrase "acting under" a federal "officer." And, though we find considerable regulatory detail and supervision, we can find nothing that warrants treating the FTC/Philip Morris relationship as distinct from the usual regulator/regulated relationship. This relationship, as we have explained, cannot be construed as bringing Philip Morris within the terms of the statute.[39]

The Court also distinguished the government contractor line of cases, such as the Agent Orange and asbestos cases, by reasoning that the defendants in those cases were assisting the federal government by producing an item that the government needed pursuant to a contract. *Id.* No such contractual relationship existed in the *Watson* case.

In *MTBE Prod. Liab. Litig.*, the plaintiffs brought claims against private companies that "manufactured, refined, marketed, or distributed gasoline containing MTBE" on the grounds that this additive contaminated water supplies.[40] The defendants attempted to remove the case under the federal officer removal statute on the grounds that the federal Clean Air Act and regulations promulgated by the Environmental Protection Agency (EPA) required them to reformulate their

---

[38] 120 S. Ct. at 2308 (internal cites omitted).
[39] *Id.*
[40] 480 F.3d at 114.

gas with additives such as MTBE to "oxygenate" the gas and therefore reduce emissions in certain metropolitan areas.[41] The District Court concluded that the defendants had satisfied the "acting under" requirement for removal on the grounds that the defendants used MTBE because EPA regulations required them to oxygenate their product for certain metropolitan areas. Even though other additives had been approved to oxygenate gasoline, the District Court noted that "both Congress and the EPA were aware that the defendants would have to use MTBE in order to comply with the Clean Air Act's requirements."[42] The District Court further noted that MTBE was the only approved additive available in a quantity sufficient to comply with the EPA's regulations. *Id.* The Second Circuit reversed. According to the court, there was no evidence of "an explicit directive in either the Clean Air Act or its implementing regulations" that required the use of MTBE. *Id.* In other words, while the statute and implementing regulations required defendants to oxygenate their gas, the regulations did not *mandate* that this be done by the addition of a specific additive, namely MTBE.[43] Nor did the court find evidence that these regulations were implemented with the knowledge that the use of MTBE was the only way that the defendants could comply with the directives of the EPA's regulations.[44]

In the present case, Defendants contend that Plaintiffs' claims challenge the following aspects of their pre-SLCRMA activities that were allegedly governed by federal regulations and directives during World War II:

- how Defendants spaced wells;

- Defendants' use of dredged canals instead of roads;

---

[41] *Id.*
[42] *Id.* at 126.
[43] *Id.*
[44] *Id.*

- Defendants' use of vertically drilled wells;

- Defendant's use of earthen pits and centralized tank batteries;

- Defendants' practices involving water discharged from drilling sites and the failure to re-inject saltwater; and

- Defendants' use of inadequate tubing.[45]

Defendants characterize the U.S. oil and gas industry as essentially an agent of the federal government during World War II, and that the industry's activities were tightly controlled to support the country's war efforts.[46] They contend that federal regulations and directives issued during the war mandated the activities challenged by Plaintiffs. Specifically, in 1941, President Franklin Roosevelt created the Office of Petroleum Coordinator,[47] which subsequently was renamed the Petroleum Administration for War ("PAW").[48] PAW issued directives to the oil industry to manage the allocation of material for necessary operations and to maximize oil and gas production needed for the war. One example offered by Defendants is PAW-issued directives mandating the spacing of oil wells in order to preserve materials.[49] Defendants argue that since PAW controlled the materials necessary for drilling activities, oil companies were required to comply with PAW mandates in order to function. They also argue that the government set production quotas. Plaintiffs, however, argue that PAW did not "order" oil and gas companies to meet quotas, but rather imposed conservation measures known as "allowables," or ceilings on the amounts that producers were allowed to produce so that reservoirs were preserved.[50]

---

[45] Defendants' Mem. at 24-31 [doc. 97]. The Court notes that Plaintiffs challenge how Defendants have characterized their allegations but the court need not resolve that dispute in addressing the elements of § 1442(a).
[46] Defendants' Mem. At 13–15 [doc. 97].
[47] *See* Exhibit X-10 at 353–54, 359; X-11 at 703 to Doc. 97.
[48] *See* Exhibit X-9 at 141 to Doc. 97; see also X-47; X-11 at 738 to Doc. 97.
[49] *See* Exhibit X-29 to Doc. 97.
[50] *See* Exhibit 33 to Doc. 97.

Applying the reasoning of *Watson* and *MTBE Prod. Liab. Litig.* to the facts of this case, Defendants have not demonstrated the "subjection, guidance, or control" required to show that they were acting under a federal office or officer.[51] First, unlike *Winters* and *Zeringue*, Defendants have not shown that their World War II era activities were mandated by PAW or any other federal agency. For example, Defendants point to no actual federal directive governing well spacing.[52] Nor have they shown that PAW or any other federal agency mandated vertically drilled wells.[53] Defendants have referred to three specific instances of federal involvement with operations in the East and West Hackberry fields, where this particular case is located.[54] Each of the three instances involved applications for exceptions to Order M-68, which is the PAW order issued regarding conservation of materials.[55] Each of the three applications were approved and the companies seeking permission were allowed to obtain materials under less stringent requirements. Critically, Defendants have not offered any instances where PAW prohibited any of their activities in these areas. As in *MTBE Prod. Liab. Litig.,* there is no evidence that PAW and other federal agencies directed Defendants' activities or that they mandated how Defendants were to comply with federal regulations and directives. In sum, the record demonstrates little more than a regulated industry complying with the requirements of a federal regulatory regime. But as *Watson* emphasized,

---

[51] *Zeringue v. Crane Co.*, 846, F.3d 785, 793 (5th Cir. 2017) (citing *Watson v. Philip Morris Cos., Inc.*, 551 US 142 (2007))."

[52] Plaintiffs' Mem. at 12 [doc.67-1].

[53] *Id.* While Defendants cite specific federal directives, as Plaintiffs point out, these directives do not mandate or otherwise direct and control the activities challenged by Plaintiffs. *Id.* For example, Defendants cite Petroleum Administrative Order (PAO) 11 as an example of a directive banning directional drilling and a PAW letter interpreting PAO 11 to require an exception for directional drilling. Defendants' Mem. at 11. At most, this PAO and PAW letter show that the federal government required an *exception* for directional drilling. This requirement, however, was eliminated eight months after the issuance of PAO 11. *Id.* Moreover, directional drilling was never "banned."

[54] *See* Exhibit 122 to Doc. 97 (approved application for an exception to Order M-68 in order to obtain material for 4 wells The Texas Company proposed to drill on less stringent spacing requirements); Exhibit 123 to Doc. 97 (approved application for an exception to Order M-68 to obtain materials for 12 wells Stanolind Oil and Gas proposed to drill on less stringent spacing requirements); and Exhibit 124 to Doc. 97 (approved application for an exception to Order M-68 to obtain materials to replace flowlines from above mentioned Stanolind wells).

[55] Exhibit 30 to Doc. 97.

compliance with a regulatory regime standing alone does not amount to the control and direction required as grounds for federal officer removal.[56]

Second, the record does not reflect the government contractor relationship that existed in *Winters* and *Zeringue*. In those cases, the courts highlighted the fact that the defendants were supplying products needed by the federal government pursuant to contracts, and that without these contracts the government would have to produce the products themselves. In this context, a state court lawsuit that targeted a contractor's activities under a government contract would threaten the government's ability to procure the goods that it needs. On the other hand, mere compliance with federal regulations does not raise the same policy concern. As explained by the *Watson* Court:

> Without evidence of some such special relationship, Philip Morris' analogy to Government contracting breaks down. We are left with the FTC's detailed rules about advertising, specifications for testing, requirements about reporting results, and the like. This sounds to us like regulation, not delegation. If there is a difference between this kind of regulation and, say, that of Food and Drug Administration regulation of prescription drug marketing and advertising (which also involve testing requirements), *see Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1316 (C.A.D.C.1998), that difference is one of degree, not kind.[57]

Here, federal agencies likely entered into contracts for the sale of oil, gas, and other petroleum products during World War II to support the war effort. But as noted by Plaintiffs, the oil and gas industry includes "upstream" activities – exploration and production of oil and gas – and "downstream" activities – the actual refinement of crude oil into usable petroleum products. Although Defendants gloss over this distinction, any World War II contracts would have generally involved "downstream" refined petroleum products, while the federal regulation at issue here involved "upstream" exploration and production activities. Thus, unlike *Winters* and *Zeringue*,

---

[56] 120 S. Ct. at 2308.
[57] *Id.*

17

the Plaintiffs' claims are not grounded in activities mandated by government contracts but are based on Defendants' compliance with a federal war-time regulatory regime.

Finally, Defendants' argument fails to account for the significant role of the *state's* regulation of Defendants during this same time period. Defendants contend that World War II era federal regulations "sidelined" state regulators.[58] The facts in the record do not support this characterization. As Plaintiffs note in their Memoranda in Support of their Motions to Remand, World War II era federal regulation did not displace regulation by the State of Louisiana. Indeed, the record reflects that from 1941 through 1945, the Louisiana Office of Conservation issued 397 field orders directed toward specific fields, and 11 state-wide directories.[59] Plaintiffs point to 101 regulatory hearings held by the Louisiana Department of Conservation in 1943 without any evidence of interference by PAW.[60] Moreover, individual oilfield "allowables" – i.e., the amount that a field could produce over a period of time – were set by the Louisiana Department of Conservation.[61] In light of the extensive, parallel state regulation of the oil and gas industry during this period, the federal government's World War II era regulation of the industry cannot be characterized as so pervasive that it resulted in "subjection, guidance, or control" by the federal government required to remove under § 1442(a).

    2.    <u>Causal Nexus.</u>

The third requirement for removal under § 1442(a) requires a causal nexus between the actions taken under federal control and the charged conduct; this element is not met when a defendant's challenged actions are "free of federal interference." *See Savoie v. Huntington Ingalls,*

---

[58] Defendants' Mem. at 16 [doc. 97].
[59] Exhibit 1 at 3 [doc. 67-3].
[60] Exhibit 6 [doc. 67-3].
[61] Exhibits 27 – 31 [doc. 67-3]. PAW exercised its authority over statewide production by setting statewide allowables. *Id.*

*Inc.,* 817 F.3d 457, 463 (5th Cir. 2016). To satisfy this requirement, a defendant must show that the actions it took under the "subjection, guidance, or control" of the federal government *caused* the plaintiff's specific injuries.[62]

Some courts have observed that the 2011 amendment to the federal officer removal statute appears to replace the causal nexus test with a less restrictive test. Prior to 2011, § 1442(a) permitted removal by a federal officer who is sued "for any act under color of such office." That statute was amended by Congress in 2011 to allow removal by a federal officer in suits "for ***or relating to*** any act under color of such office."[63] The Fifth Circuit has continued to apply the causal nexus test as it existed prior the 2011 amendment and this test is still binding precedent.[64] In *Latiolais*, the court acknowledged the apparent disconnect between the 2011 amendment to the statute and the application of the pre-amendment causal nexus test, but concluded that:

> All of these cases post-date the 2011 amendment to Section 1442(a)(1), and all continue to cite *Bartel,* while drawing a distinction for removal purposes between claims for negligence (not removable) and strict liability (removable) pursuant to the causal nexus test. We are bound by this series of cases.

In May 2019, however, the Fifth Circuit granted Huntington Ingalls' petition for rehearing en banc specifically to address whether the causal nexus analysis must be modified to address the 2011 amendment.[65] Until this issue is ultimately decided, the Court must apply the existing causal nexus test as set forth in *Bartel*. Nevertheless, regardless of which causal nexus test is applied, the Defendants have failed to satisfy the "acting under" requirement for federal officer jurisdiction and accordingly, the ruling in *Latiolais* will not change this Court's ruling on the Motions to Remand. Courts have noted that the "acting under" and "causal nexus" requirements for federal

---

[62] *Id.*
[63] 28 U.S.C. §1442(a)(1) (emphasis added).
[64] *See Bartel v. Alcoa S.S. Co., Inc.*, 805 F.3d 169 (5th Cir 2015); *Legendre v. Huntington Ingalls, Inc.*, 885 F.3d 398 (5th Cir. 2018).
[65] *Latiolais v. Huntington Ingalls, Inc.* will be reheard by the full Fifth Circuit in September 2019.

officer removal tend to "collapse" into a single inquiry:  were the actions that form the basis for the plaintiff's claims carried out under the "subjection, guidance, or control" ofp the federal government?[66] The Court answers this question in the negative because, at most, Defendants have shown activities undertaken in compliance with federal regulations, which is not sufficient to remove under §1442(a).  Accordingly, the Court need not separately address causation or the requirement that Defendants have a colorable federal defense.

### C. Federal Question Jurisdiction.

Defendants alternatively argue that this Court has "federal question" jurisdiction over this case under 28 U.S.C. § 1331. This Court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Cases "arise under" federal law in two ways: (1) "federal law creates the cause of action"; or (2) "the plaintiff's right to relief [under state law] necessarily depends on resolution of a substantial question of federal law."[67] Federal question jurisdiction turns on allegations contained in a "well-pleaded" complaint.[68] Under the "well pleaded complaint" rule -- which applies to the Court's original and removal jurisdiction -- "federal question jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint."[69]  This rule "makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law."[70]

The typical case for "arising under" jurisdiction is where federal law creates the plaintiff's cause of action. Here, Defendants' argument addresses a question that has long vexed federal

---

[66] *MTBE Prod. Liab. Litig.*, 488 F.3d at 125.
[67] *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 689-90 (2006) (internal quotation marks omitted) (citing *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 27-28 (1983)).
[68] *See Franchise Tax Board of Cal. v. Construction Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1 (1983).
[69] *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987).
[70] *Id.*

courts: when does a state law claim that includes a question of federal law satisfy the "arising under" prong of federal jurisdiction? With respect to this question, the Supreme Court recently observed that in "outlining the contours of this slim category, we do not paint on a blank canvas." *Gunn v. Minton*, 568 U.S. 251, 133 S. Ct. 1059, 1065 (2013). Rather, "[u]nfortunately, the canvas looks like one that Jackson Pollock got to first." *Id.* In *Merrill Dow Pharm. Inc. v. Thompson*, 478 U.S. 804 (1986), the Supreme Court adopted a restrictive view of "arising under" jurisdiction over a state law claim that included a federal law issue. In so doing, the *Merrill Dow* Court seemed to embrace the view that the federal statute at issue had to create a cause of action; if not, there was no basis for federal court jurisdiction. *Id.*

Defendants rely on a more recent effort by the Court to address this question, *Grable & Sons Metal Products v. Darue Eng'g & Mfg.*, 545 U. S. 308 (2005). In *Grable*, the Court concluded that "a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."[71] Later, in *Gunn*, the court explained that *Grable* creates a four part test for determining whether a state law claim that contains a federal issue gives rise to federal court jurisdiction:

- **First**, the federal issue is "necessarily raised" in the context of the plaintiff's claim;

- **second**, the federal issue is "actually disputed;"

- **third**, the federal issue "substantial;" and

- **fourth**, the federal issue is "capable of resolution in federal court without disrupting the federal-state balance approved by Congress."[72]

---

[71] *Id.* at 312.
[72] *Id. at 258.*

21

The Court assumes without deciding that Defendants can show the first *Grable* requirement. With respect to the second *Grable* factor, however, Defendants have not shown that the federal issue in this case is a legal issue that is "actually disputed." Defendants assert that in order to establish "bad faith" practices occurring prior to SLCRMA, Plaintiffs will have to rely on conduct and practices conducted under the supervision and direction of pre-1980 federal regulatory regimes, including World War II era regulation by PAW. The questions raised by the impact of this regulatory scheme, however, are grounded primarily on factual inquiries into a historical regulatory regime and how that regime affected Defendants' operations. These factual inquiries do not involve substantive *legal* disputes over the meaning of federal law. In *Empire Healthchoice Assurance, Inc. v. McVeigh*,[73] the Supreme Court stressed that federal question jurisdiction under *Grable* was appropriate when a case presented a "nearly pure issue of law," rather than a "fact-bound and situation specific" issue. As the Court held in *Empire Healthchoice Assurance*, "*Grable* emphasized that it takes more than a federal element "to open the 'arising under' door." 545 U.S., at 313, 125 S.Ct. 2363. This case cannot be squeezed into the slim category *Grable* exemplifies."[74]

With respect to the third *Grable* requirement, Defendants have not shown any issues of federal law arising out of the World War II federal regulation of the oil and gas industry that are "substantial" in the context of the Plaintiffs' claims. These purported federal law issues relate to the "historical use" or "legally commenced" exemption to the permitting requirements of the SLCRMA. This exemption is a matter of *state* law that turns on whether Defendants' pre-SLCRMA activities or "uses" were "legally commenced or established prior to the effective date" of the SLCRMA in 1980. Whether these activities were "legally commenced or established" requires consideration of the entire period before 1980, including Defendants' activities during

---

[73] 547 U.S. 677, 701 (2006).
[74] *Id.*

this period and the regulatory regimes that were in place. Defendants' jurisdictional "hook," however, relies on a federal war-time regulatory scheme that existed over a relatively short period from 1941 through 1945 and which expired over *seventy years* ago. This jurisdictional hook does not present a substantial federal issue for at least three reasons.

First, the "substantiality" of a federal issue under *Grable* turns on "the importance of the issue to the federal system as a whole."[75] Defendants have not shown that the resolution of any legal questions involving the federal government's World War II era regulations would have any relevance to any current federal regulatory regime involving the oil and gas industry.

Second, any federal issue involving World War II era regulations will not be central to this case. In judging substantiality, the Supreme Court has referred to "the *centrality* of the federal issue."[76] As used by the Court, "centrality" does not mean the number of citations to federal law, but the importance of federal law to resolving the case.[77] Here, the overwhelming focus of this case will be substantial questions of *state* law: the application of Louisiana's SLCRMA and the "legally commenced" exemption to the permitting requirements of that statute. World War II era regulations will play only a small role in deciding these state law questions.[78] Put a different way, the minor role of federal law does not "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."[79]

Third, the resolution of legal issues involving World War II era federal regulations has little relevance today given the role of state regulation of the industry and the changes in the regulatory landscape during the seventy-year period following the war. As Plaintiffs point out,

---

[75] *Gunn*, 568 U.S.251, 133 S. Ct. at 1066.
[76] *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 699 n. 5 (2006) (emphasis added).
[77] *New York ex rel. Cuomo v. Dell, Inc.*, 514 F. Supp. 2d 397, 399 (N.D. N.Y. 2007).
[78] *See*
[79] *Merrill Dow*, 545 U.S. at 312.

federal regulation of Defendants' activities never displaced the State of Louisiana's regulation of the oil and gas industry. During that period, the two regulatory regimes operated within their own spheres. After World War II, the federal government ultimately shifted more regulatory responsibility to the states. For example, Plaintiffs cite the passage in Title 1972 of the federal Coastal Zone Management Act, which was intended in part to "enhance state authority by encouraging and assisting states to assume planning and regulatory powers over their coastal zones."[80] Moreover, Louisiana passed SLCRMA in 1980, which impacts the activities of oil and gas exploration and production companies through the issuance of coastal use permits and other regulations. Accordingly, the resolution of any federal issues arising from the federal government's World War II era regulation of the oil and gas industry now would be made in the context of a much different regulatory environment in which Louisiana and other states play a much larger role in regulating the oil and gas industry.

This change in the regulatory environment is also relevant to *Grable's* fourth and final factor. Specifically, the record does not reflect that a federal court resolution of any federal issues arising from World War II era regulations is consistent with the "federal-state balance approved by Congress" given the shift in regulatory responsibilities from the federal government to the states. As a result, denying a federal forum for Plaintiffs' claims would not upset the allocation of judicial power between federal and state courts.[81]

Finally, Defendants assert that the *Levee Board*[82] decision dictates federal question jurisdiction. In *Levee Board*, the Fifth Circuit found federal jurisdiction over state law tort claims.

---

[80] Plaintiffs' Mem. at 22 [doc. 67-1] (citing S. Rep. No. 92-753 at 1, 1972 U.S.C.C.A.N. 4776).
[81] *Id.* at 1067 (in a case involving attorney malpractice claims, observing that the state has a strong interest and role in regulating lawyers).
[82] *Board of Comm'rs of the Se. Louisiana Flood Prot. Auth-E. v. Tennessee Gas Pipeline Co., LLC*, 850 F.3d 714, 723-24 (5th Cir. 2017), *cert. denied sub nom.*, ___ U.S.___, 138 S. Ct. 420 (2017).

The Board of Commissioners of the Southeast Louisiana Flood Protection Authority-East sued oil and gas companies involved in exploration and production activities off the southern coast, alleging that the activities caused infrastructural and ecological damage to coastal lands overseen by the Levee Board that increased the risk of flooding due to storm surges and required costly flood protection measures.[83] The Board asserted causes of action for negligence, strict liability, natural servitude of drain, nuisance, and breach of contract as to third-party beneficiaries. The Board sued in state court; the defendants removed, asserting the court's "arising under" jurisdiction. The Board's complaint specifically described "a longstanding and extensive regulatory framework under both federal and state law" that protects against the effects of dredging activities and establishes the legal duties by which defendants purportedly are bound.[84] Although none of the individual causes of action relied on federal law and the negligence, strict liability, and natural servitude claims relied on state law, the complaint identified federal and state regulatory sources bearing on oil and gas activities, including the Rivers and Harbors Act, the Clean Water Act, and the Coastal Zone Management Act. The plaintiff itself in *Levee Board* specifically invoked an extensive regulatory framework under both federal and state law aimed at protecting against the effects of dredging activities. The *Levee Board* case is distinguishable from the instant case. There, the plaintiffs alleged specific violations of federal laws and duties. Here, Plaintiffs here do not allege any federal law violations. Other courts have also held that this type of case does not fall within the limited category of cases set forth in *Grable* and *Levee Board*.[85]

---

[83] *Id.*

[84] *Id.*

[85] *See The Parish of Plaquemines v. Riverwood Production Co., et al*, Civil Action No. 18-5217 (E.D. La. 5/28/19) for an examination of cases arising under SLCRMA.

As the court finds that Defendants have failed to establish grounds for either federal officer jurisdiction or federal question jurisdiction, Plaintiffs' Motions to Remand are GRANTED.

**D. Certificate of Appeal.**

Defendants are entitled to an immediate appeal under 28 U.S.C. § 1447(d) as far as the Court's ruling on their entitlement to removal under the federal officer removal statute, and they have indicated that they plan to do so. They therefore request that the Court certify for interlocutory appeal their asserted federal question predicate for removal. The request is GRANTED. The Court finds that its Order and Reasons addresses controlling issues of law as to which there might be substantial ground for difference of opinion. 28 U.S.C. §1292(b). So certified, the Fifth Circuit might in its discretion permit an appeal of all issues contained in this Reasons for Decision.

The Court will issue a separate Order in conformity with these Reasons for Decision.

THUS DONE in Chambers on this 26th day of September, 2019.

Robert R. Summerhays
United States District Judge