# United States Court of Appeals for the Fifth Circuit

---

No. 19-30492

---

United States Court of Appeals
Fifth Circuit

**FILED**

August 5, 2021

Lyle W. Cayce
Clerk

THE PARISH OF PLAQUEMINES,

*Plaintiff—Appellee*,

THE STATE OF LOUISIANA, EX REL, JEFFREY MARTIN LANDRY, ATTORNEY GENERAL; THE STATE OF LOUISIANA, THROUGH THE LOUISIANA DEPARTMENT OF NATURAL RESOURCES OFFICE OF COASTAL MANAGEMENT AND ITS SECRETARY, THOMAS F. HARRIS,

*Intervenors—Appellees*,

*versus*

CHEVRON USA, INCORPORATED, AS SUCCESSOR IN INTEREST TO CHEVRON OIL COMPANY AND THE CALIFORNIA COMPANY; EXXON MOBIL CORPORATION, AS SUCCESSOR IN INTEREST TO EXXON CORPORATION AND HUMBLE OIL AND REFINING COMPANY; CONOCOPHILLIPS COMPANY, AS SUCCESSOR IN INTEREST TO GENERAL AMERICAN OIL COMPANY OF TEXAS,

*Defendants—Appellants*,

CONSOLIDATED WITH

---

No. 19-30829

---

PARISH OF CAMERON,

No. 19-30492
c/w No. 19-30829

*Plaintiff—Appellee*,

STATE OF LOUISIANA, EX REL, JEFF LANDRY; STATE OF
LOUISIANA, ON BEHALF OF LOUISIANA DEPARTMENT OF
NATURAL RESOURCES, ON BEHALF OF OFFICE OF COASTAL
MANAGEMENT, ON BEHALF OF THOMAS F. HARRIS,

*Intervenors—Appellees*,

*versus*

BP AMERICA PRODUCTION COMPANY; CHEVRON PIPE LINE
COMPANY; CHEVRON USA HOLDINGS, INCORPORATED;
CHEVRON USA, INCORPORATED; EXXON MOBIL CORPORATION;
KERR-MCGEE OIL; GAS ONSHORE, L.P.; SHELL OFFSHORE,
INCORPORATED; SHELL OIL COMPANY; SWEPI, L.P.; TEXAS
COMPANY,

*Defendants—Appellants*.

---

Appeals from the United States District Courts for the
Eastern and Western Districts of Louisiana
USDC No. 2:18-CV-05217
USDC No. 2:18-CV-0677

---

ON PETITION FOR REHEARING

Before HO, ENGELHARDT, and OLDHAM, *Circuit Judges*.

JAMES C. HO, *Circuit Judge*:

The petition for rehearing is granted, the prior opinion in this case is withdrawn, and the following is substituted in its place, in light of new information provided to the court in response to our request for supplemental briefing and our further consideration of the issues presented in this appeal.

No. 19-30492
c/w No. 19-30829

The petition for en banc rehearing is denied, as no judge in active service requested that the court be polled.

\* \* \*

Six Louisiana parishes, joined by the Louisiana Attorney General and the Louisiana Secretary of Natural Resources, brought forty-two suits challenging decades of drilling activities by various oil companies. In this consolidated appeal, we do not reach the merits of these suits. Instead, we conclude that because an expert report filed by the parishes revealed a new theory of liability for the first time, the companies' removal based on federal-officer jurisdiction was timely. Rather than deciding whether federal-officer jurisdiction exists, however, we remand for the district courts to address this question with the benefit of our recent en banc decision in *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 290 (5th Cir. 2020). In addition, we agree with both district courts that there is no federal-question jurisdiction in this case. Accordingly, we affirm in part, reverse in part, and remand.

## I.

Congress enacted the Coastal Zone Management Act of 1972 to encourage states to manage their coasts in an environmentally sound manner through federally approved programs. *See* 86 Stat. 1280 (codified as amended at 16 U.S.C. §§ 1451–65); 16 U.S.C. § 1452(2). Following that invitation, Louisiana enacted the Louisiana State and Local Coastal Resources Management Act of 1978 (SLCRMA). La. Stat. Ann. §§ 49:214.21–:214.42.

SLCRMA establishes a permitting program for anyone wishing to "use" coastal resources within Louisiana's coastal zone. *Id.* § 49:214.30(A)(1). The Act defines "use" as any activity with "a direct and significant impact on coastal waters." *Id.* § 49:214.23(13). It authorizes Louisiana courts to impose civil liability and damages and order

No. 19-30492
c/w No. 19-30829

environmental restoration measures for "uses conducted within the coastal zone without a coastal use permit . . . or which are not in accordance with the terms and conditions of a coastal use permit." *Id.* § 49:214.36(E). The Act also contains a grandfather clause allowing "uses legally commenced or established prior to the effective date of the coastal use permit program" to continue without requiring "a coastal use permit." *Id.* § 49:214.34(C)(2). Much of this dispute concerns drilling activities that first took place before the Act's effective date, and whether those activities were "legally commenced or established."

The parishes sued various oil companies engaged in oil and gas exploration, production, and transportation along Louisiana's coast since the 1940s. The parishes' petitions, which are materially identical in each case, allege that the companies violated SLCRMA by failing to obtain necessary coastal use permits or by violating the terms of the permits they did obtain. Regarding the companies' activities before SLCRMA went into effect in 1980, the parishes allege that the grandfather clause does not apply because those activities were not "lawfully commenced or established" before 1980. *See id.* § 49:214.34(C)(2). Specifically, the petitions allege:

> Plaintiffs allege that most, if not all, of Defendants' operations or activities complained of herein were not "lawfully commenced or established" prior to the implementation of the coastal zone management program. *See* [LA. ADMIN. CODE tit. 43, § ]723(B)(8). The complained-of operations and activities were prohibited prior to 1978 by various provisions of Louisiana Statewide Orders 29, 29-A, and 29-B, various field wide orders, as well as various orders of the Louisiana Stream Control Commission.

Louisiana Statewide Orders 29, 29-A, and 29-B were first issued in the early 1940s by the Louisiana Office of Conservation. They regulate numerous aspects of oil and gas production, such as the type of sign that must be posted

before drilling is commenced, the records that companies must keep, the number of sacks of cement that should be used for the surface casing, the measures that must be taken to minimize fire hazards, and the production and disposal of salt water. *See* La. Dep't of Conservation, Order No. 29-B, State-Wide Order Governing the Drilling for and Producing of Oil and Gas in the State of Louisiana §§ II(D), IV, VII(B), VIII, XV (July 19, 1943). The content of these orders changed frequently before 1978. Between 1951 and 1974, for example, Order 29-B was amended twenty-four times. *See* La. Dep't of Conservation, Order No. 29-B, State-Wide Order Governing the Drilling for and Producing of Oil and Gas in the State of Louisiana (Aug. 26, 1974). Nothing in the petitions identifies which of the many orders of the Louisiana Stream Control Commission or the "various field wide orders" the companies allegedly violated before 1978.

Also attached to the petitions were maps of the areas where the parishes alleged that the companies' violations occurred as well as a list of 760 well serial numbers located within those areas. Some of the wells were drilled during World War II.

The parishes disclaim any "cause of action arising under federal law or federal regulations." So when the companies first tried to remove these cases, the district courts remanded based on the absence of a federal question. *See, e.g.*, *Parish of Cameron v. Auster Oil & Gas, Inc.*, 2018 WL 2144281, at *3 (W.D. La. May 9, 2018); *Stutes v. Gulfport Energy Corp.*, 2017 WL 4286846, at *15 (W.D. La. June 30, 2017), *report and recommendation adopted*, 2017 WL 4274353 (W.D. La. Sept. 26, 2017); *Plaquemines Parish v. Rozel Operating Co.*, 2015 WL 403791, at *5 (E.D. La. Jan. 29, 2015).

No. 19-30492
c/w No. 19-30829

In response to a Louisiana court's order that the parishes provide specific details of the companies' alleged violations of SLCRMA, Plaquemines Parish served an expert report on April 30, 2018. That report ("the *Rozel* report") certified that it represented the position of the Louisiana Department of Natural Resources in all forty-two cases. It argued that to be "lawfully commenced or established" under SLCRMA—and thus to benefit from its grandfather clause—"[a]ctual construction or operation of the use or activity must have been begun, in good faith" before SLCRMA and "[n]o significant change in the nature, size, location or impacts of the use or activity" must have occurred. That interpretation of "lawfully commenced or established" was taken from a 1980 environmental impact statement (called the Louisiana Coastal Resources Program Final Environmental Impact Statement, or "FEIS") that the Louisiana Department of Natural Resources prepared in order to gain federal approval for Louisiana's coastal management program.

The *Rozel* report further contended that a use or activity did not begin "in good faith" if it departed from prudent industry practices. It then explained how the companies departed from prudent industry practices before 1980: by dredging canals (instead of building overland roads), by using vertical drilling (instead of directional drilling), by using earthen pits at well heads (instead of steel tanks), by extracting too much oil, and by not building saltwater reinjection wells.

The companies contend that the *Rozel* report unveiled a new legal theory as to how the companies' operations were not lawfully commenced or established before 1980 and identified for the first time the specific production practices that established liability under that new theory.

Based on that revelation, the companies again sought to remove all forty-two cases to federal court. The companies contend that the *Rozel*

report was the first time that the parishes made clear that they were suing the companies based on actions they took during World War II, while acting under the authority of a federal wartime agency, namely, the Petroleum Administration for War (PAW). That made the case removable, the companies theorize, under the federal-officer removal statute, 28 U.S.C. § 1442. The companies also contend that the *Rozel* report confirms that the suits implicate federal-question jurisdiction.

The parishes again moved to remand the cases. Both the Eastern and Western Districts of Louisiana granted those motions and ordered the cases be remanded back to state court. In the Eastern District of Louisiana, the district court held that removal was untimely, and, in the alternative, found that neither federal-officer nor federal-question jurisdiction existed. *Parish of Plaquemines v. Riverwood Prod. Co.*, 2019 WL 2271118 (E.D. La. May 28, 2019). In the Western District of Louisiana, the district court found that removal was timely, but nevertheless held that neither federal-officer nor federal-question jurisdiction existed. *Parish of Cameron v. Auster Oil & Gas Inc.*, 420 F. Supp. 3d 532 (W.D. La. 2019). The companies timely appealed both of these decisions, and we granted their motion to consolidate. On appeal, the companies claim that these suits may be removed to federal court based on federal-officer jurisdiction under 28 U.S.C. § 1442, as well as federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1441.

## II.

An order remanding a case to state court is "not generally reviewable." *Latiolais*, 951 F.3d at 290. But an order remanding a case to state court after having been removed under the auspice of § 1442, the federal-officer removal statute, is reviewable "by appeal or otherwise." *Id.* (quoting 28 U.S.C. § 1447(d)). We review the remand order de novo "without a thumb on the remand side of the scale." *Id.* (quotation omitted).

No. 19-30492
c/w No. 19-30829

The companies seek to remove based on two grounds: federal-officer jurisdiction and federal-question jurisdiction. We consider each in turn.

## III.

We begin our analysis by examining whether the companies' invocation of the federal-officer removal statute was timely. That statute authorizes removal by "any officer (or any person acting under that officer) of the United States or of any agency thereof, [sued] in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). At the time the companies filed their notice of removal, this court required the companies to demonstrate "a causal nexus" between their acts under color of federal office and the parishes' claims, among other requirements. *See Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998), *overruled by Latiolais*, 951 F.3d at 296. After the district courts issued their decisions regarding removal, this court overruled the causal-nexus requirement. *Latiolais*, 951 F.3d at 296.

Regarding timeliness, there are two deadlines for filing a notice of removal. First, a notice of removal must be filed "within 30 days after the receipt by the defendant . . . of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based." 28 U.S.C. § 1446(b)(1). That deadline applies where the basis for federal jurisdiction is evident "on [the] face" of the complaint. *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994). *See also Chapman v. Powermatic, Inc.*, 969 F.2d 160, 163 (5th Cir. 1992) (holding that the removal clock runs from "the initial pleading only when that pleading affirmatively reveals on its face" the grounds for removal).

Alternatively, if the basis for federal jurisdiction is not evident on the face of the initial pleading, a defendant may remove the case to federal court "within thirty days after receipt by the defendant . . . of an amended pleading,

No. 19-30492
c/w No. 19-30829

motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b)(3). To start that clock, the information supporting removal in that "other paper" "must be unequivocally clear and certain." *Bosky v. Kroger Texas, LP*, 288 F.3d 208, 211 (5th Cir. 2002) (quotation omitted).

## A.

With this in mind, we turn to the first question in our timeliness inquiry: whether the parishes' petitions affirmatively revealed on their face any grounds for federal-officer removal. *See Chapman*, 969 F.2d at 163. We hold that they did not.

The parishes' petitions revealed that at some point before 1980, "most, if not all" of the companies' "operations or activities complained of herein" were allegedly "not 'lawfully commenced or established'" because those operations "were prohibited prior to 1978 by various provisions of Louisiana Statewide Orders 29, 29-A, and 29-B, various field wide orders, as well as various orders of the Louisiana Stream Control Commission." In addition, the well serial numbers attached to the petitions alerted the companies to the location of the wells within the area where these violations allegedly occurred.

In short, the petitions informed the companies that, at some point before 1978, they allegedly violated various Louisiana regulations. The petitions also told the companies where those alleged violations occurred.

But the petitions did not reveal which provisions of those regulations the companies allegedly violated or when those violations occurred. For example, Louisiana Statewide Order 29-B covers everything from putting up the right sign to installing firewalls—yet the petitions do not reveal which of the many provisions of that order the companies allegedly violated, much less which version of that frequently-changing order the petitions invoke. Nor

did the petitions reveal which of the "various field wide orders" or "various orders of the Louisiana Stream Control Commission" the companies allegedly violated.

At most, the petitions revealed that certain World War II-era conduct *might* be implicated by the parishes' suit, because World War II occurred before 1978. This led the district court in *Riverwood* to conclude that the companies' removal was untimely. It reasoned that "[t]he plaintiffs have plainly and consistently indicated that the defendants' pre-SLCRMA conduct is relevant to their SLCRMA cause of action." *Riverwood*, 2019 WL 2271118, at *7. But pre-SLCRMA conduct is not the same as World War II-era conduct. And the timeliness standard requires more than a possibility that certain conduct might be relevant; it requires the petitions to "affirmatively reveal[] on [their] face" the information the companies needed to invoke federal-officer removal. *Chapman*, 969 F.2d at 163.

To be sure, Louisiana Statewide Orders 29 and 29-A were in effect only during World War II. *See* La. Dep't of Conservation, Order No. 29, State-Wide Order Governing the Drilling for and Producing of Oil and Gas in the State of Louisiana (July 15, 1941) [hereinafter Order 29]; La. Dep't of Conservation, Order No. 29-A, State-Wide Order Governing the Drilling for and Producing of Oil and Gas in the State of Louisiana (May 20, 1942) [hereinafter Order 29-A]. These provisions are explicitly mentioned in the petitions. Perhaps tellingly, however, the parishes did not substantially rely on this theory either before or during oral argument.

After oral argument, we requested supplemental briefing addressing whether the allegation that the companies violated these World War II-era regulations sufficiently revealed grounds for federal-officer removal. In

response, the parishes argued that it did because those orders prohibited each of the production activities that the companies now claim were directed by the federal government during World War II. Thus, the parishes contend, the companies cannot claim that the *Rozel* report revealed, for the first time, the allegations that the companies should have used steel tanks instead of earthen pits, exceeded production limits, failed to install saltwater reinjection wells, and failed to employ directional drilling. And because these orders were only in effect during World War II, the parishes say, there's no guesswork involved as to whether that wrongdoing occurred during World War II.

We disagree. None of the provisions of these World War II-era regulations cover the specific conduct that the companies rely on to establish federal-officer jurisdiction. And even if a particular provision of the orders did cover such conduct, none of the petitions' factual allegations revealed that the companies violated that specific provision.

First, the companies argue that federal-officer jurisdiction exists because the *Rozel* report alleges that the companies should have used steel tanks instead of earthen pits, yet PAW directives reserved steel for other uses essential to the war effort. While the orders provide that waste should be burned or disposed of in a manner that avoids "polluting streams and fresh water strata," they say nothing about the means of complying with that directive. *See* Order 29, § VIII(E) ("All waste shall be burned or disposed of in such a manner as to avoid creating a fire hazard of polluting streams and fresh water strata."); Order 29-A, § VIII(E) (same). Nor do the petitions discuss steel tanks or tubing. Thus, the reference to these orders did not affirmatively reveal the grounds for removal based on federal directives limiting the use of steel.

Second, the companies argue that the PAW's oil production requirements conflict with the *Rozel* report's allegation that the companies' operations were not lawfully commenced because they extracted oil at high rates. Although the wartime version of Order 29-B, § X, regulates daily "well allowables," nothing in the petitions suggested that the companies violated those limits. As a result, the petitions did not affirmatively reveal that the companies allegedly violated oil production limits.

Third, the companies argue that federal wartime directives did not permit saltwater reinjection wells, which conflicts with the *Rozel* report's allegation that the companies' operations were not lawfully commenced because they failed to build saltwater reinjection wells. But nothing in the orders required the companies to use saltwater reinjection wells. The parishes contend that because Order 29, § XIII, requires that wells producing saltwater obtain permission from the Stream Control Commission to dispose of the brine, and Stream Control Commission Rule 8 requires that disposal of oilfield brine be done through wells, the petitions affirmatively revealed grounds for removal. Not so.

The petitions' allegation that the companies violated "various orders of the Louisiana Stream Control Commission" did not affirmatively reveal to the companies that they violated Rule 8. In any event, Rule 8 did not apply to coastal areas until after the war was over. *See, e.g.*, *Texas Co. v. Montgomery*, 73 F. Supp. 527, 530 (E.D. La. 1947) (analyzing whether plaintiffs had notice of 1947 changes to Rule 8 expanding the rule to coastal waters). So this ground for removal was not clear from the petitions, either.

Finally, the companies sought to remove based on the *Rozel* report's allegation that the companies' operations were not commenced in "good faith" because they failed to engage in directional drilling. This allegation, the companies argued, conflicted with a federal wartime directive prohibiting

directional drilling. The companies contend that this ground for removal was not apparent from the allegation that the companies violated the orders because those orders also prohibit directional drilling. We agree. *See* Order 29, § XVII ("No well shall be drilled in the State of Louisiana in which the well bore shall deviate laterally at any point a distance greater than that determined by a three (3) degree angle from a vertical line passing through the center . . . "). Further, the petitions do not mention directional drilling.

In sum, none of the allegedly unlawful production practices that the companies point to in support of removal were affirmatively revealed in the parishes' petitions.

The parishes further argue that the petitions started the removal clock because the companies contend that the federal government directed *all* of their activities during World War II, and the petitions allege that "most, if not all" of the companies' pre-1980 activities were not "legally commenced." *See* Notice of Removal at 3, 22, *Riverwood*, 2019 WL 2271118 (No. 2:18-CV-5217) (claiming that "the federal government exercised pervasive control over nearly every aspect of oil and gas production" and that "[t]he oil and gas industry could not act of its own accord during World War II."). Because World War II obviously occurred before 1980, the parishes argue, the petitions told the companies all they needed to know to remove.

But to establish a causal nexus, the companies needed to connect the dots between their alleged wrongdoing and a federal wartime directive. *See Winters*, 149 F.3d at 398. Even if the companies might have been able to point to a federal wartime directive for many of the potential violations of the hundreds of provisions contained in the Louisiana orders cited in the petitions, the fact that the petitions did not reveal to the companies what, specifically, they did wrong means that the companies were still left guessing as to how to connect the dots. And while it might be obvious that World

War II occurred before 1980, it is not at all obvious that the companies' alleged violations of the Louisiana orders occurred that far back.

Lastly, the parishes claim that the legal theories in the *Rozel* report were nothing new because the petitions alleged that the companies' activities were not "lawfully commenced or established" and the FEIS's interpretation of that phrase has been publicly available since 1980. The district court in *Riverwood* agreed, concluding that the *Rozel* report "simply put a finer point on what the plaintiffs already placed at issue: whether the defendants' activities in these operational areas were lawfully commenced prior to SLCRMA's enactment." 2019 WL 2271118, at *6. Thus, it continued, the report "d[id] not present this theory or concept [of how the companies' operations were unlawfully commenced] for the first time and therefore present[ed] no changed circumstances supporting removal." *Id.*

We disagree with this characterization. The *Rozel* report didn't just put a finer point on what the parishes have been alleging all long—it revealed an entirely new legal theory. The petitions alleged that the companies' operations were not "lawfully commenced or established" before 1980 because those operations violated various Louisiana environmental orders before 1978. By contrast, the *Rozel* report—relying not on the Louisiana orders but on the FEIS—alleged that the companies' operations were not "lawfully commenced or established" because those operations were not "commenced in good faith" and violated the requirement that "[n]o significant change in the nature, size, location or impacts of the use or activity take place." It further defined the absence of "good faith" based on the companies' departure from various prudent industry practices, which did not appear in the FEIS. The petitions did not alert the companies that they should look not just to the Louisiana orders referenced by the petitions, but also to a 1980 environmental impact statement in order to discern their alleged wrongdoing. Moreover, nothing in the FEIS explains that an absence

of "good faith" means a failure to follow any of the specific prudent industry practices outlined by the *Rozel* report. Thus, in contrast to the petitions' vague citations to Louisiana regulations covering numerous aspects of oil production, the *Rozel* report identified, for the first time, specific conduct that the parishes alleged was unlawful.

\* \* \*

Without knowing which portions of the orders they allegedly violated or when those violations occurred, the companies had no way of connecting their alleged violations of SLCRMA to World War II-era directives. Accordingly, the petitions did not affirmatively reveal grounds for federal-officer removal, and the district court in *Riverwood* erred by concluding otherwise. We agree with the district court in *Auster*: although the parishes' original petitions may have put the companies "on notice that some activities occurring during the broad time period before 1980 may be at issue in this case," "the trigger for starting the removal clock requires a higher burden," which was not met here. 420 F. Supp. 3d at 538–39.

## B.

Next, we ask whether any "other papers" revealed information that made the grounds for federal-officer removal "unequivocally clear and certain," thus starting the removal clock before the *Rozel* report was served. *Bosky*, 288 F.3d at 211 (quotation omitted). We conclude that the "other papers" cited by the parishes did not make grounds for federal-officer removal unequivocally clear and certain. Accordingly, we hold that the companies' removal on federal-officer grounds was timely.

First, the parishes contend that the companies cannot claim to be surprised by the *Rozel* report because the companies were served with a copy of the FEIS during the first round of removals in 2013. However, as the companies pointed out in their petition for rehearing, the parishes did so by

attaching the entirety of this 382-page document to certain briefs, citing the FEIS solely for the propositions that Louisiana's coastal management program had received federal approval and that it was implemented under a Memorandum of Understanding with the Army Corps of Engineers. It cannot be said that this "other paper" made federal-officer removal "unequivocally clear and certain"—especially since the FEIS does not discuss the prudent industry practices that the parishes fault the companies for not following and since the plain text of the petitions indicates that the companies' operations were not lawfully commenced because they violated various Louisiana orders.

Second, the parishes argue that their discovery requests started the removal clock. For example, the parishes consistently defined the "relevant period" for discovery purposes as "January 1, 1920 to November 8, 2013." Citing these discovery requests, the district court in *Riverwood* concluded that the "examples of 'other paper' that should have triggered the defendants' earlier awareness [of their removal bases] are resounding." 2019 WL 2271118, at *6.

Not so. These requests merely underscore the fact that the parishes' allegations are quite broad. They did not tell the companies what they did to violate the Louisiana orders—essential information for the causal-nexus requirement.

Third, the parishes argue that the companies' own discovery filings and responses prove that the companies "fully understood long before the [*Rozel* report] that pre-SLCRMA activities, including activities dating back to WWII and before, were at issue." For example, one of the companies indicated that it "obtained required permits for canal construction within the Coastal Zone from the appropriate agency over time, including the U.S. War

No. 19-30492
c/w No. 19-30829

Department" and produced various War Department permits in response to the parishes' discovery requests.

The parishes get the inquiry wrong. The question is not whether the companies were aware that "activities dating back to WWII and before[] were at issue." The question is whether other papers clearly revealed a causal nexus between a federal wartime directive and the companies' alleged wrongdoing. That the companies produced wartime permits in response to the parishes' request for all documents relating to the companies' oil production activities across a 93-year period might indicate that the companies were on notice that World War II-era conduct *might* be relevant, but that does not make removal unequivocally clear and certain. *See Morgan v. Huntington Ingalls, Inc.*, 879 F.3d 602, 609 (5th Cir. 2018) (explaining that a defendant must be able to "ascertain" removability with "a high level of certainty").

More problematically for the parishes, an "'other paper' must result from the voluntary act of a *plaintiff*." *Addo v. Globe Life & Acc. Ins. Co.*, 230 F.3d 759, 762 (5th Cir. 2000) (emphasis added). *See also* 28 U.S.C. § 1446(b)(3) (providing that "a notice of removal may be filed within thirty days after *receipt by the defendant, through service or otherwise*, of a copy of an amended pleading, motion, order or other paper . . .") (emphasis added); *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir. 1996) ("[A]n affidavit created by the defendant and based on the defendant's subjective knowledge cannot convert a non-removable action into a removable one."); *Gaitor v. Peninsular & Occidental S.S. Co.*, 287 F.2d 252, 254 (5th Cir. 1961) (explaining that "other paper" requires a voluntary act of the plaintiff, and that an initially non-removable case "cannot be converted into a removable one by evidence of the defendant or by an order of the court"). Thus, the companies' own discovery responses in this case cannot serve as an "other paper" that started the removal clock.

\* \* \*

The *Rozel* report revealed, for the first time, the specific conduct that the companies engaged in before 1980 that supported the parishes' theory of liability. Without knowing what they did wrong before 1980, the companies could not have established a causal nexus between their conduct and the government's wartime directives. Accordingly, the companies' removal on federal-officer grounds was timely, and the district court in *Riverwood* erred by concluding otherwise.

## IV.

Though the companies' removal based on federal-officer jurisdiction was timely, we do not reach the underlying jurisdictional question in this appeal. Both district courts to address the issue did so under this court's now-overruled causal-nexus test. *See Auster*, 420 F. Supp. 3d at 545–46; *Riverwood*, 2019 WL 2271118, at \*10–11. Accordingly, we remand for the district courts to consider whether federal-officer jurisdiction exists in light of *Latiolais*, 951 F.3d 286.

## V.

The companies alternatively assert that removal is proper because federal-question jurisdiction exists. Although the petitions specifically disavow reliance on federal law, the companies nevertheless contend that the parishes' right to relief under state law necessarily depends on the resolution of a substantial question of federal law. *See Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).

Although we have appellate jurisdiction to review this portion of the district courts' remand orders, and the companies' invocation of federal-question jurisdiction is timely, we ultimately agree with the district courts that federal-question jurisdiction does not exist.

## A.

An order remanding a case to state court is "not generally reviewable." *Latiolais*, 951 F.3d at 290. The text of 28 U.S.C. § 1447(d) provides two exceptions: "An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was removed pursuant to section 1442 [federal-officer removal] or 1443 [removal of certain civil rights cases] of this title shall be reviewable by appeal or otherwise."

Until recently, there was a circuit split as to whether § 1447(d) allows appellate review of *any* issue encompassed in a district court's remand order, or whether it limits appellate review to the grounds for removal falling within § 1447(d). In *BP p.l.c. v. Mayor and City Council of Baltimore*, 141 S. Ct. 1532 (2021), the Supreme Court put this debate to rest, holding that "when a district court's removal order rejects all of the defendants' grounds for removal, § 1447(d) authorizes a court of appeals to review each and every one of them." *Id.* at 1538. As a result, we have appellate jurisdiction to review this ground for removal.

## B.

For many of the reasons stated above, we find that the companies' invocation of federal-question jurisdiction was timely. The companies argue that, to establish that SLCRMA's grandfather clause does not apply due to "bad faith" practices pre-dating the Act or "changed impacts," the parishes must demonstrate violations of pre-1980 federal dredging permits. Because dredging prior to 1980 was governed exclusively by federal law, the companies argue, this case necessarily raises substantial questions of federal law. Nothing in the petitions or other papers prior to the *Rozel* report alerted the companies that their dredging activities violated federal law before 1980.

No. 19-30492
c/w No. 19-30829

## C.

We agree with both district courts that there is no federal question jurisdiction in this case. The Supreme Court has explained that "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013). The district court in *Riverwood* put the point well: "[O]nly a 'special and small category' of cases . . . fit all four criteria. This is not one of them." 2019 WL 2271118, at *18 (citation omitted) (quoting *Gunn*, 568 U.S. at 258).

The companies fail to point to any federal laws or regulations that are "actually disputed." In *Grable*, the Court held that a state quiet title proceeding could be removed to federal court because it turned on the pure legal question of what notice was required by federal law—a question that required the court to interpret federal law. 545 U.S. at 314–16.

That is not the case here. As the district court in *Auster* observed, "[t]he questions raised by the impact of this regulatory scheme [of the oil industry] . . . are grounded primarily on factual inquiries into a historical regulatory regime and how that regime affected Defendants' operations. These factual inquiries do not involve substantive legal disputes over the meaning of federal law." 420 F. Supp. 3d at 547. The district court in *Riverwood* likewise concluded that the companies "gloss over entirely fact-bound determinations and instead focus on the implausibility of the plaintiffs' cause of action, rather than identifying substantial and disputed issues of federal law." 2019 WL 2271118, at *20.

Further, federal question jurisdiction under *Grable* is only appropriate when a case presents a "nearly pure issue of law"—and not, as here, where

No. 19-30492
c/w No. 19-30829

the case is "fact-bound and situation-specific." *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 700–01 (2006) (quotation omitted).[1]

* * *

Removal was timely because neither the parishes' original petitions nor any "other papers" revealed that the companies could remove based on either federal-officer jurisdiction or federal-question jurisdiction. We agree with the district courts that federal-question jurisdiction does not exist here. But we reverse and remand for the district courts to consider whether federal-officer jurisdiction exists under *Latiolais*. Accordingly, we affirm in part, reverse in part, and remand.

---

[1] The companies also rely on *Bd. of Comm'rs of S.E. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co.*, 850 F.3d 714 (5th Cir. 2017). In that case, the Board of Commissioners of the Southeast Louisiana Flood Protection Authority sued companies for their oil exploration and production activities in state court, asserting various state law causes of action. *Id.* at 720–21. Although none of these causes of action relied on federal law, the complaint identified federal and state regulatory sources bearing on oil and gas activities, including the Rivers and Harbors Act, the Clean Water Act, and the Coastal Zone Management Act. *Id.* The court found that federal question jurisdiction existed under *Grable* because "the Board's complaint draws on federal law as the exclusive basis for holding Defendants liable for some of their actions," and resolving the case required deciding whether federal law created those grounds for liability. *Id.* at 722–24. But the same is not true for this case. Here, the parishes explicitly disclaim any reliance on federal law. And the companies' argument that the only duties imposed on them before the enactment of SLCRMA must be those defined by federal law is "at best an argument based on defensive preemption," which is insufficient to establish federal question jurisdiction under *Grable*. *Riverwood*, 2019 WL 2271118, at *21. *See also Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) ("[I]t is now settled law that a case may *not* be removed to federal court on the basis of a federal defense, including the defense of pre-emption.").



# United States Court of Appeals
# for the Fifth Circuit

Certified as a true copy and issued
as the mandate on Sep 07, 2021

Attest: *Lyle W. Cayce*

Clerk, U.S. Court of Appeals, Fifth Circuit

No. 19-30492

United States Court of Appeals
Fifth Circuit

**FILED**

August 5, 2021

Lyle W. Cayce
Clerk

THE PARISH OF PLAQUEMINES

*Plaintiff—Appellee*,

THE STATE OF LOUISIANA, EX REL, JEFFREY MARTIN LANDRY, ATTORNEY GENERAL; THE STATE OF LOUISIANA, THROUGH THE LOUISIANA DEPARTMENT OF NATURAL RESOURCES OFFICE OF COASTAL MANAGEMENT AND ITS SECRETARY, THOMAS F. HARRIS,

*Intervenors—Appellees*,

*versus*

CHEVRON USA, INCORPORATED, AS SUCCESSOR IN INTEREST TO CHEVRON OIL COMPANY AND THE CALIFORNIA COMPANY; EXXON MOBIL CORPORATION, AS SUCCESSOR IN INTEREST TO EXXON CORPORATION AND HUMBLE OIL AND REFINING COMPANY; CONOCOPHILLIPS COMPANY, AS SUCCESSOR IN INTEREST TO GENERAL AMERICAN OIL COMPANY OF TEXAS,

*Defendants—Appellants*,

CONSOLIDATED WITH

No. 19-30829

PARISH OF CAMERON,

No. 19-30492

Plaintiff—Appellee,

State of Louisiana, ex rel, Jeff Landry; State of Louisiana, *on behalf of* Louisiana Department of Natural Resources, *on behalf of* Office of Coastal Management, *on behalf of* Thomas F. Harris,

Intervenors—Appellees,

*versus*

BP America Production Company; Chevron Pipe Line Company; Chevron USA Holdings, Incorporated; Chevron USA, Incorporated; Exxon Mobil Corporation; Kerr-McGee Oil & Gas Onshore, L.P.; Shell Offshore, Incorporated; Shell Oil Company; Swepi, L.P.; Texas Company,

Defendants—Appellants.

————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:18-CV-5217

————————————————————

ON PETITION FOR REHEARING

Before Ho, Engelhardt, and Oldham, *Circuit Judges*.

J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

2

    IT IS ORDERED and ADJUDGED that the judgment of the
District Court is AFFIRMED IN PART and REVERSED IN PART,
and the cause is REMANDED to the District Court for further proceedings
in accordance with the opinion of this Court.

    IT IS FURTHER ORDERED that each party to bear own costs
on appeal to be taxed by the Clerk of this Court.

# *United States Court of Appeals*
## FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

September 07, 2021

Ms. Carol L. Michel
U.S. District Court, Eastern District of Louisiana
500 Poydras Street
Room C-151
New Orleans, LA 70130

Mr. Tony R. Moore
Western District of Louisiana, Lafayette
United States District Court
300 Fannin Street
Suite 1167
Shreveport, LA 71101-0000

        No. 19-30492   Parish of Plaquemines v. Chevron
                USDC No. 2:18-CV-5217
Consolidated with 19-30829 Parish of Cameron v. BP America
                USDC No. 2:18-CV-677

Dear Ms. Michel and Mr. Moore,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                        Sincerely,

                        LYLE W. CAYCE, Clerk

                        *Mary Stewart*

                        By: _____
                        Mary C. Stewart, Deputy Clerk
                        504-310-7694

cc:
        Mr. George Arceneaux III
        Ms. Kelly Brechtel Becker
        Mr. William Joseph Boyce
        Mr. James B. Canfield
        Mr. Donald T. Carmouche
        Mr. George Scott Christian
        Ms. Jennifer Jo Clark

Mr. William Peter Connick Sr.
Ms. Michele Hale DeShazo
Mr. Thomas More Flanagan
Mr. David Charles Frederick
Ms. Colleen Garcia
Mr. Andre' Collins Gaudin
Mr. Matthew T. Heartney
Mr. Anders F. Holmgren
Mr. Russell Keith Jarrett
Mr. Steven Beauregard Jones
Mr. Peter D. Keisler
Mrs. Deborah DeRoche Kuchler
Mr. Thomas Allen Lorenzen
Mr. Rocco F. Magni
Mr. Victor L. Marcello
Mr. Eric Julian Mayer
Mr. Robert Beattie McNeal
Ms. Nancy Gordon Milburn
Mr. Ryan C. Morris
Mr. Michael Raudon Phillips
Mr. William Christopher Pooser
Mr. Donald Wayne Price
Mr. Jeffrey Edward Richardson
Mr. Ryan Michael Seidemann
Mr. Daniel Severson
Mr. Martin A. Stern
Mr. Brandon J. Taylor
Mrs. Megan Kathleen Terrell
Ms. Alexandra Giselle White