UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

PARISH OF CAMERON ET AL

VERSUS

AUSTER OIL & GAS INC ET AL

CASE NO.  2:18-CV-00677

JUDGE ROBERT R. SUMMERHAYS

MAGISTRATE JUDGE PEREZ-MONTES

### REASONS FOR DECISION

The present matters before the Court are a Motion to Remand [ECF No. 67] filed by the Parish of Cameron and a Motion to Remand [ECF No. 71] filed by intervenor-plaintiffs, the State of Louisiana ex rel., the Louisiana Attorney General, and the Louisiana Department of Natural Resources (hereafter, state and parish parties referred to collectively as "Plaintiffs"). The original removal was based on the "federal-officer removal" provision in 28 U.S.C § 1442(a)(1). The Court had previously granted the two motions to remand.[1] On appeal, the United States Court of Appeals for the Fifth Circuit vacated the Court's remand order and remanded the case for the Court to consider whether the circuit court's intervening decision in *Latiolais v. Huntington Ingalls, Inc.*,[2] supports removal under section 1442(a)(1). Finding that it does not, the Court GRANTS the motions to remand [ECF Nos. 67 and 71].

## I.
## BACKGROUND

Several Louisiana parishes filed forty-two lawsuits against various oilfield-related defendants[3] (hereafter, all defendants in these matters will collectively be referred to as

---

[1] ECF No. 147.
[2] 951 F.3d 286, 290 (5th Cir. 2020).
[3] Alpine Exploration Companies, Inc., Anadarko E&P Onshore, LLC, Anderson Exploration Company, Incorporated, Apache Corporation (Of Delaware), Apache Oil Corporation, Atlantic Richfield Company, Auster Oil and Gas, Inc.,

"Defendants") in state court alleging violations of permits issued under the State and Local Coastal

Resources Management Act of 1978 ("SLCRMA") also known as the Coastal Zone Management

Act, La. Rev. Stat. § 49:214.21 *et seq*., and associated regulations, rules, and ordinances ("CZM

laws") based upon the defendants' dredging, drilling, and waste disposal in coastal parishes.[4]

SLCRMA provides a cause of action against companies that either violate a state-issued

coastal use permit or fail to properly obtain a coastal use permit when required. The act also

contains certain exemptions from the coastal use permitting requirements, namely, uses which do

---

Badger Oil Corporation, Ballard Exploration Company, Inc., Bay Coquille, Inc., Bepco, L.P., Bopco, L.P., BP America Production Company, Brammer Engineering, Inc., Burlington Resources Oil & Gas Company, LP, Cedyco Corporation, Central Resources, Inc., Centurion Exploration Company, Chevron Pipe Line Company, Chevron U.S.A. Holdings, Inc., Chevron U.S.A., Inc., Condor Petroleum Corporation, ConocoPhillips Company, Covey Energy, Inc., Crimson Exploration Operating, Inc., Cypress E&P Corporation, Darsey Operating Corporation, Davis Oil Company, Davis Petroleum Corporation, Denbury Onshore, LLC, Denovo Oil & Gas, Inc., Devon Energy Production Company, L.P., Diasu Oil & Gas Company, Dominion Oklahoma Texas Exploration & Production, Inc., Endeavor Energy Resources, L.P., Energen Resources Corporation, Energy Properties, Inc., Energyquest II, LLC, Enervest Operating, L.L.C., Estate of William G. Helis, Exchange Oil & Gas Corporation, Exco Resources, Inc., Exxon Mobil Corporation, Fieldwood Sd Offshore LLC, Freeport Sulphur Company, Freeport-Mcmoran Oil & Gas L.L.C., Gas Transportation Corporation, Graham Royalty, Ltd., Great Southern Oil & Gas Company, Inc., Gulfport Energy Corporation, Helis Oil & Gas Company, L.L.C., Henry Production Company, Inc., Hess Corporation, Hilcorp Energy Company, Hilliard Petroleum Inc., Linder Oil Company, A Partnership, Honeywell International, Inc., HRC Energy Holdings (La), Inc., Hunt Oil Company, Iberia Operating Corporation, Indian Exploration, Inc., Inexco Oil Company, Jones Co., Ltd., Kerr-Mcgee Oil And Gas Onshore LP, Kilroy Company Of Texas, Inc., La Mesa Production Inc., Latex-Star, Inc., Leads Resources L.L.C., Linder Oil Company, A Partnership, LLOG Exploration & Production Company, L.L.C., LLOG Exploration Company, L.L.C., Lopco, Inc., Louisiana Energy Production LLC, Lyons Petroleum, Inc., Mar-Low Corporation, Marsh Engineering, Inc., Mccormick Operating Company, Merit Energy Company, LLC, Mobil Oil Exploration & Producing, Mobil Oil Exploration & Producing Southeast Inc., Mosaic Global Holdings, Inc., Northwest Oil Company, Oleum Operating Company, L.C., Omni Operating Co., Oxy USA Inc., Palace Operating Company, Petroquest Energy, L.L.C., Resource Securities Corporation, Resources Investment Corporation, Rogers Oil Co., Sable Minerals, Inc., Samuel Gary Jr. & Associates, Inc., Shell Offshore, Inc., Shell Oil Company, Shocker Energy Of Louisiana, Inc., Shoreline Southeast LLC, SM Energy Company, Southeast Inc., Southport Exploration, Inc., Star Energy, Inc., Swepi LP, SWN Production Company, LLC, Taylor Energy Company, LLC, Texas Pacific Oil Company, Inc., Texas Petroleum Investment Company, The Louisiana Land And Exploration Company, LLC, The Meridian Resource & Exploration LLC, The Texas Company, Toce Energy, L.L.C., Total Petrochemicals & Refining USA, Inc., Transco Exploration Company, Transcontinental Oil Corporation, Union Oil Company of California, Vernon E. Faulconer, Inc., Vintage Petroleum, L.L.C., Wagner Oil Company, Walter Oil & Gas Corporation, WEC Onshore, LLC, White Oak Operating Company, LLC., Whiting Petroleum Corporation, Williams Exploration Company, Xplor Energy Operating Company, Xto Energy Inc., Zadeck Energy Group, Inc., Zenergy, Inc.

[4] *See, e.g., ECF No.* 1, att. 59, pp. 3–26.

not have a significant impact on coastal waters and activities which were "lawfully commenced" prior to the enactment of SLCRMA—the so-called "historical use" or "lawfully commenced" exemption.[5] Plaintiffs assert that Defendants' pre-SLCRMA activities were not lawfully commenced and therefore do not fall within the exemption.

The cases had been previously removed to this Court on the basis of admiralty jurisdiction, federal jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b)(1), and federal question jurisdiction under 28 U.S.C. § 1331. As for OCSLA, the Court concluded that the activities involved did not take place on the Outer Continental Shelf. The Court also found that admiralty claims brought at law in state court pursuant to the Saving to Suitors' Clause are not removable in the absence of an independent jurisdictional basis. Finally, the Court held that the defendants could not establish federal question jurisdiction because the remedies sought were specifically limited to those arising under state law.[6] The Court, therefore, remanded the cases to state court.

Defendants then, for a second time, removed this case along with eleven other cases. The current Notice of Removal, filed on May 23, 2018, asserts federal-officer jurisdiction under 28 U.S.C. § 1442(a)(1) and federal question jurisdiction under 28 U.S.C. § 1331.[7] Defendants contend that they first became aware of these removal grounds when they received an expert report in a related case on April 30, 2018.[8] Defendants argued that this expert report reveals for the first time that Plaintiffs' claims primarily attack activities undertaken before SLCRMA's effective date

---

[5] La. R.S. § 49:214.34(C)(2); (A)(10).
[6] See *Cameron Parish v. Auster Oil & Gas, Inc.*, W.D. La. 2:16-cv-530, ECF No. 89, 101 and 102.
[7] ECF No. 1.
[8] Expert report issued by Plaintiffs in the case of *Parish of Plaquemines v. Rozel Operating Co.* (the "*Rozel* Report").

(1980), including activities that were subject to extensive and exclusive federal direction, control, and regulation during World War II.[9]

Plaintiffs filed motions to remand, arguing that (1) Defendants' claim of federal-officer jurisdiction is without merit; (2) Defendants' federal question jurisdiction basis for removal has already been rejected; and (3) removal was untimely because the expert report cited as the basis for removal was received months, if not years, after the removing defendants knew or should have known the factual underpinnings of Plaintiffs' claims. Defendants opposed the motions to remand.[10] On September 26, 2019, the Court granted the two motions to remand, holding that removal was timely but that Defendants had not established grounds to remove under Section 1442(a)(1) nor had they established a basis for federal question jurisdiction.[11] Defendants filed a Notice of Appeal and the Fifth Circuit consolidated the present case with a related action pending in the United States District Court for the Eastern District of Louisiana, *Parish of Plaquemines v. Chevron USA, Inc., et al.*, for purposes of the appeal. [12]

On August 5, 2021, the Fifth Circuit issued an opinion affirming the Court's ruling on the motions to remand in part, reversing the Court's remand orders in part, and remanding both the present case and *Parish of Plaquemines* to the Western District of Louisiana and Eastern District of Louisiana, repectively.[13] The Fifth Circuit ruled that Defendants timely removed the cases from state court.[14] The Fifth Circuit panel also affirmed the rulings of the district courts in both cases that the Defendants had not established grounds for federal question jurisdiction under 28 U.S.C.

---

[9] ECF No. 1.
[10] ECF Nos. 67, 71.
[11] ECF No. 147.
[12] ECF No. 156.
[13] ECF. No. 147.
[14] *Id.* at 8-18.

§ 1331. The circuit, however, remanded the cases for both district courts to determine federal-officer removal jurisdiction in light of the circuit's intervening decision in *Latiolais v. Huntington Ingalls, Inc.*[15] In *Latiolais*, the circuit overruled its prior "causal nexus" requirement for federal-officer removal jurisdiction. On remand, the parties filed supplemental briefs addressing the new test set forth by the circuit in *Latiolais*.

On January 11, 2022, the district court in the Eastern District of Louisiana issued its second ruling on the motion to remand filed in *Parish of Plaquemines v. Chevron.*[16] The district court in *Parish of Plaquemines* applied the Fifth Circuit's new test under *Latiolais* and granted the motions to remand filed in that case.[17] The defendants in that case then, once again, filed a Notice of Appeal to the Fifth Circuit. On October 17, 2022, the Fifth Circuit issued an opinion affirming the Eastern District's remand order in the *Plaquemines Parish* case.[18]

## II.
## LAW AND ANALYSIS

### A.  Federal-Officer Removal.

A defendant may remove any action against "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, [sued in] an official or individual capacity for any act under color of such office."[19] "[F]ederal officer removal under § 1442 is unlike other removal doctrines: it is not narrow or limited."[20] The Supreme Court requires "a liberal interpretation of § 1442(a) in view of its chief purpose—to prevent federal-officers who simply comply with a federal duty from being punished by a state

---

[15] 951 F.3d 286, 290 (5th Circuit 2020).
[16] No. 18-5217, 2022 WL 101401 (E.D. La. Jan. 11, 2022).
[17] *Id.*
[18] *Plaquemines Parish v. Chevron USA, Inc.*, No. 22-30055, 2022 WL 9914869 (5th Cir. Oct. 17, 2022).
[19] 28 U.S.C. § 1442(a).
[20] *Texas v. Kleinert*, 855 F.3d 305, 311 (5th Cir. 2017).

court for doing so."[21] Section 1442 applies to any "private persons 'who lawfully assist' the federal-officer 'in the performance of his official duty.'"[22] Section 1442(a) creates an exception to the "well-pleaded complaint" rule in that "the raising of a federal question in the officer's removal petition ... constitutes the federal law under which the action against the federal-officer arises for Article III purposes."[23] A defendant may remove a case under section 1442(a) by showing "(1) that it is a person within the meaning of the statute, (2) that it has a colorable federal defense, (3) that it acted pursuant to a federal-officer's directions, and (4) that a causal nexus exists between [its] actions under color of federal office and the plaintiff's claims."[24] There is no dispute that Defendants qualify as "persons" under the first requirement. The Court, however, concluded in its original remand ruling that Defendants could not satisfy the "acting under" or "causal nexus" requirement for federal-officer removal jurisdiction under section 1442(a)(1). The "causal nexus" requirement was subsequently overruled in favor of the more lenient test in *Latiolais*.

### B. The "Acting Under" Prong.

To satisfy § 1442(a)'s "acting under" prong, a defendant must show "an effort to assist, or to help carry out, the duties or tasks of the federal superior."[25] The *Watson* court distinguished a party's *compliance* with federal regulations from actions "helping the Government to produce an item that it needs."[26]Assistance that "goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks" meets § 1442(a)'s "acting under" requirement.[27]

---

[21] *State of La. v. Sparks*, 978 F.2d 226, 232 (5th Cir. 1992).
[22] *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 151 (2007).
[23] *Mesa v. California*, 489 U.S. 121, 136 (1989).
[24] *Legendre v. Huntington Ingalls, Inc.*, 885 F.3d 398, 400 (5th Cir. 2018).
[25] *Watson*, 551 U.S. at 152.
[26] *Id.* at 153.
[27] *Id.*

To establish that a person is "acting under" a federal official, a removing party must show a "substantial degree of direct and detailed federal control over the defendant's work...."[28] This relationship between the defendant and the federal office or official must involve "subjection, guidance, or control."[29] It is not sufficient to merely show that "the relevant acts occurred under the general auspices of a federal office or officer."[30]

The cases applying this "acting under" requirement provide useful guidance as to how to draw the line between "direct control" and mere regulation. Many cases where courts have found sufficient control and direction to satisfy the "acting under" requirement involve government contractors who manufacture products according to detailed specifications and oversight by an agency or officer of the federal government.[31] For example, in *Winters,* the plaintiff sued for personal injuries received as a result of exposure to Agent Orange while working as a civilian nurse for the United States Agency for International Development in Vietnam.[32] Diamond Shamrock was a government contractor that supplied the mix of herbicides known as Agent Orange to the United States Defense Department.[33] The Fifth Circuit affirmed the district court's conclusion that Diamond Shamrock was "acting under" a federal officer or office in supplying this mix of herbicides. The court observed that the Defense Department mandated a specific mixture

---

[28] *In re "Agent Orange" Prod. Liab. Litig.*, 304 F. Supp. 2d 442, 447 (E.D. N.Y. 2004).

[29] *Zeringue v. Crane Co.*, 846, F.3d 785, 793 (5th Cir. 2017) (citing *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142 (2007))."

[30] *Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 947 (E.D. N.Y. 1992)

[31] *See, e.g., Zeringue,* 846 F.3d 785 (5th Cir. 2017) (government directives to use asbestos); *Savoie v. Huntington Ingalls, Inc.*, 817 F.3d 457, 460, 465 (5th Cir. 2016) (government requirement that contractor use asbestos in the thermal installation of Navy ships); *In re Asbestos Products Liab. Litig. (No. VI.)*, 7 F. Supp. 2d 736 (E.D. Pa. 2011) ("acting under" requirement satisfied where government contractor established that the government had approved reasonably precise specifications that called for the use of asbestos and that the contractor's products conformed to those specifications; *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 399 (5th Cir. 1998) (government contracted with the defendants for a specific mixture of herbicides known as Agent Orange); *Holdren v. Buffalo Comps, Inc.*, 614 F. Supp. 2d 129 (D. Mass. 2009) (contractor complied with precise design specifications).

[32] 149 F.3d at 390.

[33] *Id.*

of herbicides making up Agent Orange and that "the defendants were compelled to deliver Agent Orange to the government under threat of criminal sanctions."[34]   The court concluded that the federal government exercised direct control over the composition and production of Agent Orange.[35]   In other words, the plaintiff's injuries resulted from an aspect of the product that was mandated and controlled by the federal government under the terms of a contract with Diamond Shamrock.[36]

Similarly, in *Zeringue*, the plaintiff sued multiple defendants for damages caused by asbestos exposure.[37]   The plaintiff alleged exposure while deployed with the U.S. Navy as well as exposure when he worked in the Avondale Shipyard near Navy vessels that contained asbestos.[38]   The court found that the defendants had "acted under" a federal officer or office with respect to these asbestos exposure claims because the Navy had mandated the use of asbestos insulation in its contract specifications and the defendants complied with those requirements.[39]   According to the court, "equipment could not have been installed aboard Navy vessels unless it was first determined by the Navy to be in conformity with all applicable Navy specifications."[40]   The court further noted that had the defendant not complied with the specifications and provided these products to the government, "the Navy would have had to build those parts instead."[41]   In all of these cases, the plaintiffs' claims arose out of conduct *mandated* by the government.

---

[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] 846 F.3d 785.
[38] *Id.* at 788.
[39] *Id.*
[40] *Id.* at 792.
[41] *Id.*

On the other hand, two cases where the courts concluded that the "acting under" requirement was not satisfied illustrate the limits of federal-officer removal: *Watson*,[42] and *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*[43] In *Watson*, the plaintiffs alleged that Phillip Morris manipulated the design of its "light" cigarettes so that they tested for lower levels of tar and nicotine.[44] The industry's testing process for measuring tar and nicotine was operated under the regulatory supervision of the Federal Trade Commission (FTC). The Supreme Court concluded that Phillip Morris was not "acting under" the FTC even though the testing process for tar and nicotine was heavily regulated.[45] The Court noted that a private party's compliance with federal law or acquiescence to a federal agency's order does not satisfy the "acting under" requirement of the federal-officer removal statute, "even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored."[46] In other words, differences in the degree of regulatory oversight alone cannot bring a regulated party within the contours of section 1442(a):

> As we have pointed out, however, differences in the degree of regulatory detail or supervision cannot by themselves transform Philip Morris' regulatory compliance into the kind of assistance that might bring the FTC within the scope of the statutory phrase "acting under" a federal "officer." And, though we find considerable regulatory detail and supervision, we can find nothing that warrants treating the FTC/Philip Morris relationship as distinct from the usual regulator/regulated relationship. This relationship, as we have explained, cannot be construed as bringing Philip Morris within the terms of the statute.[47]

The Court also distinguished the "government contractor" line of cases, such as the Agent Orange and asbestos cases, by reasoning that the defendants in those cases were assisting the federal

---

[42] 551 U.S. 142.
[43] 480 F.3d 112 (2d Cir. 2007).
[44] 551 U.S. 142.
[45] *Id.*, at 157.
[46] *Id.*, at 143.
[47] *Id.*

government by producing an item that the government required pursuant to a contract.[48] No such contractual relationship existed in the *Watson* case.

In *MTBE Prod. Liab. Litig.*, the plaintiffs brought claims against private companies that "manufactured, refined, marketed, or distributed gasoline containing MTBE" on the grounds that this additive contaminated water supplies.[49] The defendants attempted to remove the case under the federal-officer removal statute on the grounds that the federal Clean Air Act and regulations promulgated by the Environmental Protection Agency (EPA) required them to reformulate their gas with additives such as MTBE to "oxygenate" the gas and therefore reduce emissions in certain metropolitan areas.[50] The district court concluded that the defendants had satisfied the "acting under" requirement for removal on the grounds that the defendants used MTBE because EPA regulations required them to oxygenate their product for certain metropolitan areas.[51] Even though other additives had been approved to oxygenate gasoline, the district court noted that "both Congress and the EPA were aware that the defendants would have to use MTBE in order to comply with the Clean Air Act's requirements."[52] The district court further noted that MTBE was the only approved additive available in a quantity sufficient to comply with the EPA's regulations.[53] The Second Circuit reversed. According to the court, there was no evidence of "an explicit directive in either the Clean Air Act or its implementing regulations" that required the use of MTBE.[54] In other words, while the statute and implementing regulations required defendants to oxygenate their gas, the regulations did not *mandate* that this be done by the addition of a specific additive, namely

---

[48] *Id.*
[49] 480 F.3d at 114.
[50] *Id.*
[51] *Id.*
[52] *Id.* at 126.
[53] *Id.*
[54] *Id.*

MTBE.[55] Nor did the court find evidence that these regulations were implemented with the knowledge that the use of MTBE was the only way that the defendants could comply with the directives of the EPA's regulations.[56]

### C.  Defendants' "Acting Under" Allegations.

In the present case, Defendants contend that Plaintiffs' claims challenge the following aspects of their pre-SLCRMA activities, and that these activities were governed by federal regulations and directives during World War II:

- how Defendants spaced wells;

- Defendants' use of dredged canals instead of roads;

- Defendants' use of vertically drilled wells;

- Defendant's use of earthen pits and centralized tank batteries;

- Defendants' practices involving water discharged from drilling sites and the failure to re-inject saltwater; and

- Defendants' use of inadequate tubing.[57]

Defendants characterize the U.S. oil and gas industry as essentially an agent of the federal government during World War II, and that the industry's activities were tightly controlled to support the country's war efforts.[58] They contend that federal regulations and directives issued during the war mandated the activities challenged by Plaintiffs. Specifically, in 1941, President Franklin Roosevelt created the Office of Petroleum Coordinator,[59] which subsequently was

---

[55] *Id.*

[56] *Id.*

[57] Defendants' Mem. at 24-31 [ECF No. 97]. The Court notes that Plaintiffs challenge how Defendants have characterized their allegations but the court need not resolve that dispute in addressing the elements of § 1442(a).

[58] Defendants' Mem. At 13-15 [ECF No. 97].

[59] *See* Exhibit X-10 at 353–54, 359; X-11 at 703 to ECF No. 97.

renamed the Petroleum Administration for War ("PAW").[60] PAW issued directives to the oil industry to manage the allocation of material for necessary operations and to maximize oil and gas production needed for the war. One example offered by Defendants is PAW-issued directives mandating the spacing of oil wells in order to preserve materials.[61] Defendants argue that since PAW controlled the materials necessary for drilling activities, oil companies were required to comply with PAW mandates in order to function.  They also argue that the government set production quotas.  Plaintiffs, however, argue that PAW did not "order" oil and gas companies to meet quotas, but rather imposed conservation measures known as "allowables," or ceilings on the amounts that producers were allowed to produce so that reservoirs were preserved.[62]

On remand from the Fifth Circuit, Defendants filed supplemental briefs and evidence raising an additional ground for federal-officer removal under section 1442(a)(1).[63] Defendants argue that, under *Latiolais*, the removing party's conduct at issue in the case "need only be 'connected or associated' with the federal-officer's directions."[64] Defendants contend that the new test articulated in *Latiolais* provides a basis for federal-officer jurisdiction based not on the conduct of oil and gas producers alone, but on the connection between oil and gas production and downstream refineries that operated under government contracts during World War II.[65] Defendants contend that, in order to satisfy the terms of their contracts and meet government production demands, these contractors required increased production from upstream oil and gas producers.[66] According to Defendants "oil producers were also government subcontractors,

---

[60] *See* Exhibit X-9 at 141 to ECF No. 97; see also X-47; X-11 at 738 to ECF No. 97.
[61] *See* Exhibit X-29 to ECF No. 97.
[62]  *See* Exhibit 33 to ECF No. 97.
[63] ECF Nos. 170, 175.
[64] ECF No. 170 at 1.
[65] *Id.*
[66] *Id.* at 2-5.

operating under government direction, to provide the government with critical input for products required for the war effort, further differentiating their 'special relationship' with the government from mere regulation."[67]

### D. The Fifth Circuit Addresses the "Acting Under" Requirement in *Plaquemines Parish.*

Following the supplemental briefing in this case, the Fifth Circuit decided the *Plaquemines Parish* case.[68] That case addresses the grounds for federal-officer removal under section 1442(a)(1) in a case with nearly the same factual underpinnings for removal. As here, the defendants in *Plaquemines Parish* argued that federal government regulation of oil and gas production during World War II satisfied the "acting under" requirement for federal-officer removal jurisdiction.[69] The defendants in *Plaquemines Parish* similarly argued that oil and gas producers acted as "subcontractors" to refineries during World War II, that these refineries were government contractors heavily regulated by the federal government during World War II, and that this subcontractor relationship satisfies *Latiolais*' requirement that the conduct at issue be "connected or associated" with the directives of a federal officer.[70] With respect to federal government regulation of oil and gas producers, the Fifth Circuit held that the evidence in the record showed nothing more than the fact that the producers were subject to government regulation.[71] According to the circuit, the removing party's actions "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior."[72] The Fifth Circuit concluded that merely complying with federal regulation or cooperating with federal agencies—as the evidence shows in the present

---

[67] *Id.* at 14.
[68] *Plaquemines Parish, et al v. Chevron, Inc., et al,* 2022 WL 9914869 (5th Cir. 2022)
[69] *Id.*
[70] *Id.* at *2-3.
[71] *Id.* at 3.
[72] *Id.* (*quoting Watson*, 551 U.S. at 151-52) (emphasis in original).

13

case—does not amount to carrying out "the duties or tasks of the federal superior," and thus does not support removal under section 1442(a)(1).[73]

With respect to the defendants' subcontractor arguments, the Fifth Circuit held that there was no evidence in the record of any contract creating a subcontractor relationship with the defendant producers.[74] According to the Fifth Circuit, mere "supplier relationships" are insufficient to create a subcontractor relationship.[75] The circuit further reasoned that, even if a subcontract existed, the presence of a subcontractor relationship is not sufficient to support federal-officer removal jurisdiction unless the subcontractor can independently show how they, as opposed to the prime contractor, were "subject to the federal government's guidance and control."[76] The circuit reiterated that the evidence in the record did not establish the level of control or guidance to support federal-officer removal with respect to the defendant producers. Accordingly, the Fifth Circuit affirmed the Eastern District's order remanding that case to state court.

### E. Have Defendants Established the "Acting Under" Requirement for Federal-Officer Removal under Section 1442(a)(1)?

The Fifth Circuit's analysis in *Plaquemines Parish* did not alter the analysis that this Court must apply in determining the "acting under" prong of section 1442(a)(1). Applying the reasoning of *Watson, MTBE Prod. Liab. Litig.,* and *Plaquemines Parish* to the facts of this case, Defendants have not demonstrated the "subjection, guidance, or control" required to show that they were acting under a federal office or officer.[77] First, unlike *Winters* and *Zeringue*, Defendants have not shown that their World War II era activities were mandated by PAW or any other federal agency.

---

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.* at *4.

[77] *Zeringue v. Crane Co.,* 846 F.3d 785, 793 (5th Cir. 2017) (citing *Watson v. Philip Morris Cos., Inc.,* 551 US 142 (2007))."

For example, Defendants point to no actual federal directive governing well spacing.[78] Nor have they shown that PAW or any other federal agency mandated vertically drilled wells.[79] Defendants have referred to three specific instances of federal involvement with operations in the East and West Hackberry fields.[80] Each of the three instances involved applications for exceptions to Order M-68, which is the PAW order issued regarding conservation of materials.[81] Each of the three applications were approved and the companies seeking permission were allowed to obtain materials under less stringent requirements.[82] Critically, Defendants have not offered any instances where PAW prohibited any of their activities in these areas. As in *MTBE Prod. Liab. Litig.,* there is no evidence that PAW and other federal agencies directed Defendants' activities or that they mandated how Defendants were to comply with federal regulations and directives. In sum, the record demonstrates little more than a regulated industry complying with the requirements of a federal regulatory regime. But as *Watson* emphasized, compliance with a regulatory regime standing alone does not amount to the control and direction required as grounds for federal-officer removal.[83]

Second, as in *Plaquemines Parish*, the record does not reflect the government contractor relationship that existed in *Winters* and *Zeringue*. In those cases, the courts highlighted the fact

---

[78] Plaintiffs' Mem. at 12 [ECF No.67-1].

[79] *Id.* While Defendants cite specific federal directives, as Plaintiffs point out, these directives do not mandate or otherwise direct and control the activities challenged by Plaintiffs. *Id.* For example, Defendants cite Petroleum Administrative Order (PAO) 11 as an example of a directive banning directional drilling and a PAW letter interpreting PAO 11 to require an exception for directional drilling. Defendants' Mem. at 11. At most, this PAO and PAW letter show that the federal government required an *exception* for directional drilling. This requirement, however, was eliminated eight months after the issuance of PAO 11. *Id.* Moreover, directional drilling was never "banned."

[80] *See* Exhibit 122 to ECF No. 97 (approved application for an exception to Order M-68 in order to obtain material for 4 wells The Texas Company proposed to drill on less stringent spacing requirements); Exhibit 123 to ECF No. 97 (approved application for an exception to Order M-68 to obtain materials for 12 wells Stanolind Oil and Gas proposed to drill on less stringent spacing requirements); and Exhibit 124 to ECF No. 97 (approved application for an exception to Order M-68 to obtain materials to replace flowlines from above mentioned Stanolind wells).

[81] Exhibit 30 to ECF No. 97.

[82] *See* Exhibit 122 to ECF No. 97; Exhibit 123 to ECF No. 97; and Exhibit 124 to ECF No. 97.

[83] 551 U.S. at 157.

that the defendants were supplying products needed by the federal government pursuant to contracts, and that without these contracts the government would have to produce the products themselves. In this context, a state court lawsuit that targeted a contractor's activities under a government contract would threaten the government's ability to procure the goods that it needs. On the other hand, mere compliance with federal regulations does not raise the same policy concern. As explained by the *Watson* Court:

> Without evidence of some such special relationship, Philip Morris' analogy to Government contracting breaks down. We are left with the FTC's detailed rules about advertising, specifications for testing, requirements about reporting results, and the like. This sounds to us like regulation, not delegation. If there is a difference between this kind of regulation and, say, that of Food and Drug Administration regulation of prescription drug marketing and advertising (which also involve testing requirements), *see Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1316 (C.A.D.C.1998), that difference is one of degree, not kind. [84]

Here, federal agencies likely entered into contracts for the sale of oil, gas, and other petroleum products during World War II to support the war effort. But as noted by Plaintiffs, the oil and gas industry includes "upstream" activities – exploration and production of oil and gas – and "downstream" activities – the actual refinement of crude oil into usable petroleum products.[85] Although Defendants gloss over this distinction, any World War II contracts would have generally involved "downstream" refined petroleum products, while the federal regulation at issue here involved "upstream" exploration and production activities.[86] Thus, unlike *Winters* and *Zeringue*, the Plaintiffs' claims are not grounded in activities mandated by government contracts but are based on Defendants' compliance with a federal war-time regulatory regime.

---

[84] *Id.*
[85] Plaintiffs' Joint Reply Memorandum [ECF No. 101]
[86] *Id.*

Third, as the Court noted in its original ruling, Defendants do not account for the significant role of the *state's* regulation of Defendants during this same time period. Defendants contend that World War II era federal regulations "sidelined" state regulators.[87] The facts in the record do not support this characterization. As Plaintiffs note in their Memoranda in Support of their Motions to Remand, World War II era federal regulation did not displace regulation by the State of Louisiana. Indeed, the record reflects that from 1941 through 1945, the Louisiana Office of Conservation issued 397 field orders directed toward specific fields, and 11 state-wide directories.[88] Plaintiffs point to 101 regulatory hearings held by the Louisiana Department of Conservation in 1943 without any evidence of interference by PAW.[89] Moreover, individual oilfield "allowables" – i.e., the amount that a field could produce over a period of time – were set by the Louisiana Department of Conservation.[90]  In light of the extensive, parallel state regulation of the oil and gas industry during this period, the federal government's World War II era regulation of the industry cannot be characterized as so pervasive that it resulted in "subjection, guidance, or control" by the federal government to the extent required to remove under section 1442(a)(1).

Finally, Defendants' new government subcontractor arguments fail for the same reasons that they failed in the *Plaquemines Parish* case. Here, Defendants have pointed to no evidence of any contract creating a subcontractor relationship between Defendants and downstream refiners with respect to refined products sold pursuant to government contracts. As noted by the Firth Circuit in *Plaquemines Parish*, a mere *supplier* relationship does not rise to the level of a

---

[87] Defendants' Mem. at 16 [ECF No. 97].
[88] Exhibit 1 at 3 [ECF No. 67-3].
[89] Exhibit 6 [ECF No. 67-3].
[90] Exhibits 27 – 31 [ECF No. 67-3]. PAW exercised its authority over statewide production by setting statewide allowables. *Id.*

government *subcontractor* for purposes of section 1442.[91] Moreover, as in *Plaquemines Parish*, Defendants have not demonstrated that they were "subject to the federal government's guidance and control" apart from the refiners who operated under government contracts during World War II.[92] As explained above, the examples of government guidance and control in the record establish nothing more than the fact that Defendants were subject to government regulation during World War II. This evidence is not a sufficient basis for removal under section 1442(a)(1).[93]

In sum, the record as a whole does not satisfy the "acting under" requirement for federal-officer removal under section 1442(a)(1) in light of the Fifth Circuit's decision in *Plaquemines Parish*. Defendants' failure to satisfy this requirement for removal requires that the case be remanded to state court.

### F. Consideration of *Latiolais*.

Prior to the Fifth Circuit's recent decision in *Latiolais*, a party removing a case under Section 1442(a)(1) had to establish "that the defendants acted pursuant to a federal-officer's directions and that **causal nexus** exists between the defendants' actions under color of federal office and the plaintiff's claims."[94] The *Latiolais* court noted, however, that section 1442(a) was subsequently amended, "altering the requirement that a removable case be 'for' any act under color of federal office and permitting removability of a case 'for *or relating to*' such acts."[95] The Fifth Circuit ultimately concluded in *Latiolais* that the so-called "causal nexus" requirement adopted in *Winters*—and followed in *Bartel v. Alcoa Steamship Co., Inc.*[96] and its progeny even after the

---

[91] 2022 WL 9914869, at *3.
[92] *Id.*
[93] *Id.* at *3-4.
[94] *Winters*, 149 F.3d at 398 (emphasis added).
[95] *Latiolais*, 951 F.3d at 291 (emphasis added).
[96] 805 F.3d 169 (5th Cir. 2015).

amendment of Section 1442(a)—was no longer viable. According to the court, a removing party need only establish that "the charged conduct is connected or associated with an act pursuant to a federal-officer's directions."[97]

*Latiolais'* rejection of the strict "causal nexus" test does not change the result in the present case. As the Fifth Circuit subsequently held in *Plaquemines Parish*, the record does not reflect any connection or association between Defendants and any acts taken at the direction of a federal officer. Rather, the record reflects, at most, compliance with federal regulations. To the extent that Defendants rely on federal directives to refineries during World War II, as explained in *Plaquemines Parish*, Defendants have come forward with no facts showing anything other than a supplier relationship between Defendants (or their predecessors) and downstream refineries. The Fifth Circuit has already held that a showing of a mere supplier relationship does not establish the necessary connection or association to support removal under section 1442(a)(1).[98]

\* \* \*

In sum, Defendants have not satisfied the "acting under" requirement for federal-officer removal under section 1442(a)(1). Nor have they satisfied the more lenient "connection or association" test articulated in *Latiolais*. Moreover, in its original decision on this Court's ruling on the motions to remand, the Fifth Circuit affirmed this Court's conclusion that it lacked federal question jurisdiction under 28 U.S.C. § 1331. Because there is no jurisdictional basis for this case in federal court, this case must be remanded to state court.

---

[97] *Id.* at 296.
[98] *Plaquemines Parish*, 2022 WL 9914869 at *4.

**III.**

**CONCLUSION**

For the reasons explained above, the Court GRANTS the two Motions to Remand filed in this matter [ECF Nos. 67 and 71]. In order to permit Defendants an opportunity to seek an extended stay of this ruling, the Court will temporarily stay the effect of the remand for a period of twenty (20) days. If no further stay is entered by this Court or a higher court within twenty (20) days, the Clerk is directed to transmit the case back to the state court.

THUS DONE in Chambers on this 22nd day of December, 2022.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE